# United States Court of Appeals
## For the First Circuit

No. 16-2089

UNITED STATES OF AMERICA,

Appellee,

v.

JEFFRI DÁVILA-REYES,

Defendant, Appellant.

No. 16-2143

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ D. REYES-VALDIVIA,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Franco L. Pérez-Redondo, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero, Assistant Federal Public Defender, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant José D. Reyes-Valdivia.

Raymond L. Sánchez-Maceira on brief for appellant Jeffri Dávila-Reyes.

Thomas F. Klumper, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, John A. Mathews II, Assistant United States Attorney, and David C. Bornstein, Assistant United States Attorney, were on brief, for appellee.

January 20, 2022

**LIPEZ, Circuit Judge.** These consolidated appeals arise from the U.S. Coast Guard's interdiction of a small speed boat in the western Caribbean Sea and the subsequent arrest and indictment of the three men on board for drug trafficking under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-08. In a motion to dismiss the indictment, appellants José Reyes-Valdivia and Jeffri Dávila-Reyes challenged the constitutionality of the MDLEA in multiple respects. Most relevant here, they argued that the statute, which in certain circumstances allows U.S. law enforcement to arrest and prosecute foreign nationals for drug crimes committed in international waters, exceeds Congress's authority under Article I of the Constitution. The district court denied the motion to dismiss. Both appellants then pleaded guilty pursuant to plea agreements in which each waived his right to appeal if sentenced in accordance with his agreement's sentencing recommendation provision.

On appeal, appellants renew their constitutional objections to their prosecution. In our original decision, we did not reach appellants' "primary argument" -- that their prosecution was unlawful because their vessel was not properly deemed stateless -- on the ground that "our governing precedent concerning the protective principle of international law . . . permit[ted] prosecution under the MDLEA even of foreigners on foreign vessels." United States v. Dávila-Reyes, 937 F.3d 57, 59 (1st Cir. 2019)

- 3 -

(withdrawn).[1]  That precedent, we concluded, required that we affirm appellants' convictions.

Appellants then petitioned for panel rehearing and en banc review.  We held their requests in abeyance pending the en banc decision in another drug-trafficking case involving a constitutional challenge to the MDLEA.  See United States v. Aybar-Ulloa, 987 F.3d 1 (1st Cir. 2021) (en banc).  Subsequently, based on our view that the decision in Aybar-Ulloa "diminished the force of this circuit's precedent on the protective principle," we concluded that it would no longer be appropriate to rely on that principle to uphold appellants' convictions. Order, Nos. 16-2089, 2143 (Mar. 17, 2021).  We therefore granted panel rehearing to address appellants' constitutional challenge to their prosecution under the MDLEA.

We now hold that Congress exceeded its authority under Article I of the Constitution in enacting § 70502(d)(1)(C) of the MDLEA.  That provision expands the definition of a "vessel without nationality" beyond the bounds of international law and thus unconstitutionally extends U.S. jurisdiction to foreigners on foreign vessels.  Hence, appellants' convictions must be vacated.

---

[1] The protective principle of international law "permits a nation 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.'" Dávila-Reyes, 937 F.3d at 62 (quoting United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999)).

We draw the following facts primarily from appellants' change of plea colloquies and the uncontested portions of their Presentence Investigation Reports. See United States v. Vélez-Luciano, 814 F.3d 553, 556 (1st Cir. 2016).[2] In October 2015, while patrolling waters approximately 30 nautical miles southeast of San Andrés Island, Colombia,[3] U.S. Coast Guard officers observed a small vessel[4] moving at a high rate of speed. When the occupants of the vessel became aware of the Coast Guard boat nearby, they began throwing packages and fuel barrels overboard. The Coast Guard officers approached the boat and began to question its occupants, the two appellants and a third co-defendant. Reyes-Valdivia, as the "master"[5] of the vessel, claimed Costa Rican

---

[2] We also draw some facts from statements by Coast Guard officials that were submitted to the district court as attachments to the government's Motion in Limine and Memorandum of Law in Support of Jurisdiction. See United States v. Reyes-Valdivia, No. 3:15-cr-00721-FAB (D.P.R. Mar. 25, 2016), ECF No. 46.

We note that all citations to the district court's electronic docket in this case will hereafter be cited using the short-form "Reyes-Valdivia, ECF No. __ (filing date)."

[3] Although part of Colombia, San Andrés Island is located off the coast of Nicaragua.

[4] The government's Motion in Limine describes the vessel as a 35-foot "low profile, open hull, 'go-fast-type' vessel." Reyes-Valdivia, ECF No. 46, at 3 (Mar. 25, 2016).

[5] The term "master" is synonymous with "captain." It is a legal term of art meaning the person "to whom are committed the government, care, and direction of the vessel and cargo." Kennerson v. Jane R., Inc., 274 F. Supp. 28, 30 (S.D. Tex. 1967). The statement of facts attached to Reyes-Valdivia's plea agreement

nationality for the vessel but did not provide any documentation to support that claim.[6]

The Coast Guard officers boarded and searched the vessel pursuant to a provision of an agreement between the United States and Costa Rica "Concerning Cooperation to Suppress Illicit Traffic."  See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (Dep't of State Certification).  The officers did not find any contraband, but a chemical test detected traces of cocaine.  Based on that evidence, the Coast Guard detained the three men -- all citizens of Costa Rica -- and took them to the U.S. Naval Base at Guantánamo Bay, Cuba, and then eventually to Puerto Rico.  At some point, the United States contacted the government of Costa Rica requesting confirmation of the vessel's registry or nationality, and Costa Rica subsequently responded that it could not confirm

_____

does not identify him as the "master" of the vessel, see Reyes-Valdivia, ECF No. 68, at 11 (Apr. 4, 2016), but a statement from a Coast Guard officer reports that Reyes-Valdivia identified himself as such, see id., ECF No. 46-1, at 1 (Mar. 25, 2016) (Statement of Officer Luis Rosado).

[6] The Coast Guard reported that Reyes-Valdivia initially stated that "there was no nationality for the vessel" before asserting Costa Rican nationality. Reyes-Valdivia, ECF No. 46-1, at 1 (Mar. 25, 2016) (Statement of Officer Luis Rosado).  However, this statement was not cited in the U.S. Department of State Certification as a basis for identifying the vessel as stateless. The Certification reported only that "[t]he master made a claim of Costa Rican nationality for the go fast vessel." Id., ECF No. 46-2, at 1 (Mar. 25, 2016).  Nor was the statement included in the government's version of the facts in the appellants' plea agreements.  See infra.

the vessel's registry.  The United States thus determined that, pursuant to § 70502(d)(1)(C) of the MDLEA, the boat was "without nationality" and subject to U.S. jurisdiction.[7]

All three defendants were charged with two counts of trafficking cocaine in violation of the MDLEA.  Reyes-Valdivia and Dávila-Reyes moved to dismiss the indictment for lack of jurisdiction,[8] arguing that the MDLEA, particularly § 70502(d)(1)(C), is unconstitutional.  In their view, § 70502(d)(1)(C) exceeds Congress's authority under Article I of the Constitution, and it violates the Due Process Clause of the Fifth Amendment because it is unconstitutionally vague, subject to arbitrary enforcement, and criminalizes conduct that has no nexus with the United States.  The district court denied the motion.

Reyes-Valdivia and Dávila-Reyes both subsequently agreed to plead guilty to one count of possession with intent to distribute five or more kilograms of cocaine in violation of the

---

[7] Section 70502(c)(1)(A) of the MDLEA provides that "a vessel without nationality" is "subject to the jurisdiction of the United States."  46 U.S.C. § 70502(c)(1)(A).  As explained below, § 70502(d)(1)(C) defines a "vessel without nationality" to include any vessel "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."  Id. § 70502(d)(1)(C).

[8] Reyes-Valdivia filed the motion, and the district court granted Dávila-Reyes's motion to join.

MDLEA. See 46 U.S.C. § 70503(a)(1).[9] Both men agreed to waive appellate review if sentenced in accordance with the sentencing recommendation provisions in their plea agreements. Ultimately, the district court sentenced Dávila-Reyes consistently with his agreement (a 120-month term), but sentenced Reyes-Valdivia to a term longer than proposed in his agreement (70 months instead of 57) because it found that he should be given a two-level enhancement for being the "captain" of the vessel. See U.S.S.G. § 2D1.1(b)(3)(C).

Reyes-Valdivia's motion for reconsideration was denied. Both Reyes-Valdivia and Dávila-Reyes then appealed. We affirmed their convictions on the basis that the protective principle permitted their prosecution.

## II.

As noted, this court's en banc decision in United States v. Aybar-Ulloa led us to withdraw our prior opinion and reconsider appellants' claims. In Aybar-Ulloa, the en banc court held that "international law accepts the criminal prosecution by the United States of persons . . . who [are] seized by the United States while trafficking cocaine on a stateless vessel on the high seas." 987

---

[9] The third defendant also pleaded guilty to this count and was sentenced to a 57-month term of imprisonment. He did not file an appeal.

- 8 -

F.3d at 3.[10]  In so holding, the court bypassed our circuit's precedent on the protective principle, which could have provided a straightforward basis for affirming the conviction, and instead addressed a more complex issue of international law.  Notably, the en banc court did not achieve unanimity on the legal basis for U.S. jurisdiction over foreign nationals apprehended on vessels conceded to be stateless.  See infra.  The choice of a non-unanimous analytical path over reliance on the protective principle is one basis for our conclusion that Aybar-Ulloa weakened our circuit's protective principle jurisprudence.

In addition, statements in both the majority and concurring opinions in Aybar-Ulloa more directly suggest skepticism about applying the protective principle to a foreign vessel whose occupants are foreign nationals allegedly involved in drug trafficking, at least absent acquiescence by the flag nation. The majority observed that one of our primary precedents on the protective principle -- United States v. Cardales, 168 F.3d 548 (1st Cir. 1999) -- "can be read as applying only to the circumstance where a foreign flag nation consents to the application of United States law to persons found on that nation's flagged vessel."  Aybar-Ulloa, 987 F.3d at 3.  In our prior opinion

---

[10] Generally, there is a consensus that "high seas" denotes areas outside any country's territorial waters.  See, e.g., United States v. Carvajal, 924 F. Supp. 2d 219, 234 (D.D.C. 2013), aff'd sub nom. United States v. Miranda, 780 F.3d 1185 (D.C. Cir. 2015).

in this case, we assumed that appellants' vessel was Costa Rican, as they had asserted, but we concluded that our precedent nonetheless required us to uphold their prosecution based on the protective principle. The Aybar-Ulloa majority's posited reading of Cardales, however, would foreclose reliance on the protective principle here because the record contains no consent from the Costa Rican government to the prosecution.

The Aybar-Ulloa concurring opinion aired an even broader uncertainty about the protective principle. In describing Aybar-Ulloa's contentions, the concurrence noted the long-ago observation by then-Judge Breyer that there is a "'forceful argument' against application of [the] protective principle to encompass drug trafficking on the high seas." Id. at 15 (Barron, J., concurring) (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.)); see also id. at 20 (referencing the same skepticism about the protective principle with a citation to Robinson). Both Aybar-Ulloa opinions, then, caused the panel to doubt its reliance on the protective principle to uphold Reyes-Valdivia and Dávila-Reyes's prosecution under the MDLEA. See also Aaron J. Casavant, In Defense of the U.S. Maritime Drug Law Enforcement Act: A Justification for the Law's Extraterritorial Reach, 8 Harv. Nat'l Sec. J. 191, 213 (2017) (noting that commentators have rejected the protective principle to support MDLEA prosecutions, "positing that 'the cases that see the MDLEA

- 10 -

as an exercise of protective jurisdiction fundamentally misconceive the principle'" (quoting Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1231 (2009) (emphasis omitted))); but see id. at 222-23 (noting "a circuit split over whether the crime of maritime drug trafficking warrants the use of the protective principle"); id. at 225 (stating that "the protective principle of international law is broad enough to encompass maritime drug trafficking").

Apart from any reference to the protective principle, both Aybar-Ulloa opinions include statements indicating that the prosecution of a foreign national seized on the high seas under U.S. drug-trafficking laws would not be proper unless the targeted activity and seizure occurred on a stateless vessel. The majority, for example, concludes a passage on the reasonable expectations of "those who set out in stateless vessels" by noting: "Simply put, if a person intent on drug trafficking on the high seas wants to be prosecuted in his own country should he be caught, he should sail under that country's flag." Aybar-Ulloa, 987 F.3d at 9. The majority subsequently describes its holding as limited "to vessels flouting order and custom on the high seas by eschewing the responsibilities and protections of the flag-state system." Id. at 13; see also id. at 8 (quoting United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198 (1820), for the proposition that "the

- 11 -

distinction between foreign vessels and stateless vessels serves to avoid 'offensive interference with the governments of other nations'"). In the same vein, the concurring opinion in Aybar-Ulloa notes the "fair amount of support" for the view that Congress lacks authority under Article I's Define and Punish Clause "to subject foreign nationals to our criminal laws" for acts occurring on foreign vessels on the high seas. Id. at 15 (Barron, J., concurring).[11]

In sum, we see in Aybar-Ulloa multiple signals that the majority of judges on our court do not view the protective principle as supporting U.S. jurisdiction over drug-trafficking

---

[11] Elsewhere, the Aybar-Ulloa concurrence notes that "the application of the MDLEA to Aybar[-Ulloa]'s conduct in this case" -- i.e., conduct aboard a stateless vessel -- would likely be consistent with international law,

> [e]ven if we were to assume that the law of nations places limits on Congress's power under the Define and Punish Clause to subject foreign nationals on foreign vessels in international waters to our domestic criminal laws, and even if we were to assume that the United States may not assert protective jurisdiction over drug trafficking merely because it occurs on stateless vessels in international waters, see Robinson, 843 F.2d at 3-4.

987 F.3d at 20. Although the Aybar-Ulloa concurrence does not take a position on those hypotheticals, we view them -- and the reiterated citation to Robinson -- to indicate a level of doubt about the applicability of the protective principle, at a minimum, to drug-trafficking activity by foreign nationals on foreign vessels.

- 12 -

activity conducted on the high seas by foreign nationals on foreign vessels.[12] Hence, in light of Aybar-Ulloa, we decline to rely on the protective principle to uphold appellants' convictions. Rather, the question we must answer is whether -- as the United States claims -- appellants' vessel was properly deemed stateless, bringing the vessel and its occupants within the scope of the holding in Aybar-Ulloa.

Before addressing that question, however, we review and elaborate on our reasons, set forth in the withdrawn panel opinion, for rejecting the government's argument that appellants waived their claims of constitutional error. See Dávila-Reyes, 937 F.3d at 60-61.

**III.**

The government contends that Reyes-Valdivia and Dávila-Reyes waived their right to appeal in two distinct ways: by the express appellate waiver provisions in their plea agreements and by entry of unconditional guilty pleas to drug trafficking in violation of the MDLEA. With respect to Reyes-Valdivia, the government is wrong in arguing that his appeal is barred by his plea agreement. As described above, the district court declined

---

[12] Of course, consent by the flag nation changes the calculus, as acknowledged by one commentator who has advocated for use of the protective principle in the context of drug-trafficking on the high seas. See Casavant, supra, at 223 (noting that "consent of the flag or coastal state" is a "check on the exercise of U.S. criminal jurisdiction").

to follow the parties' recommended term of 57 months and instead sentenced him to a 70-month term of imprisonment. Because Reyes-Valdivia's sentence exceeded the recommendation, the waiver provision plainly does not apply.[13]

Dávila-Reyes, however, received a 120-month sentence that aligns with the recommendation in his plea agreement. He argues that, despite the enforceable waiver, we should exercise our inherent authority to consider his claims to avoid "a miscarriage of justice." United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001). He contends that his appeal raises "important questions of law and [of] first impression" -- including the constitutionality of § 70502(d)(1)(C) of the MDLEA -- and that preventing him from bringing his appeal would be unjust.

We agree that the constitutional issue Dávila-Reyes raises is significant and that the other factors allowing us to exercise our discretion to disregard the appellate waiver also are sufficiently present. See, e.g., United States v. Ortiz-Vega, 860 F.3d 20, 27-28 (1st Cir. 2017). Particularly important is the lack of prejudice to the government, given Reyes-Valdivia's

---

[13] The government contends that Reyes-Valdivia is nonetheless bound by the waiver provision because he failed to explain in his opening brief why it is inapplicable. However, it is apparent on the face of the plea agreement that Reyes-Valdivia was not sentenced in accordance with the sentencing recommendation provision, and he was not obligated to make that obvious point in his opening brief. See United States v. Colón-Rosario, 921 F.3d 306, 310-11 (1st Cir. 2019).

presentation of the same issues as Dávila-Reyes. See id. at 27. Moreover, the potential for relief should not depend on the happenstance that the district court added an enhancement to Reyes-Valdivia's sentence. Thus, we exercise our discretion and decline to enforce Dávila-Reyes's appellate waiver.

Nor do appellants' guilty pleas foreclose their right to challenge the constitutionality of the MDLEA. The Supreme Court held in Class v. United States that "a guilty plea by itself" does not bar "a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." 138 S. Ct. 798, 803 (2018). In their briefing and oral argument, appellants present claims that are permissible under Class. Although they conceded through their guilty pleas that the MDLEA, by its terms, allows the government to prosecute them under U.S. law, they argue that Congress exceeded constitutional limits with the enactment of the applicable provision. In other words, appellants contend that their convictions were within the scope of the statute but nonetheless unconstitutional. Such claims may proceed notwithstanding an unconditional guilty plea. See id. at 805 (holding that a guilty plea does not bar claims that challenge "the Government's power to criminalize [the defendant's] (admitted) conduct" because "[t]hey thereby call into question the Government's power to 'constitutionally prosecute him'" (quoting United States v. Broce, 488 U.S. 563, 575 (1989))).

- 15 -

The government asserts that Class does not apply here because appellants "admitted without qualification that their vessel was one 'subject to the jurisdiction of the United States,'" without limiting the basis for jurisdiction to § 70502(d)(1)(C) (whose text is reproduced in footnote 7).[14] Appellee's Supp. Br. at 18-19. In making that assertion, the government cites to the appellants' general acknowledgment of guilt at their change-of-plea hearing but disregards their specific admissions. The prosecution -- and, accordingly, appellants' admissions of guilt -- was premised on their vessel's statelessness under § 70502(d)(1)(C). The indictment stated generally that jurisdiction was based on appellants' vessel being one without

---

[14] The statutory phrase "a vessel subject to the jurisdiction of the United States" in the MDLEA concerns legislative jurisdiction -- in other words, Congress's authority to enact legislation "regulat[ing] drug trafficking on [] ships" -- rather than the subject-matter jurisdiction of the federal courts. United States v. González, 311 F.3d 440, 443 (1st Cir. 2002); see also United States v. Prado, 933 F.3d 121, 130 (2d Cir. 2019) (adopting and elaborating on this interpretation and rejecting the alternative approach of other circuits). But see United States v. Miranda, 780 F.3d 1185, 1192 (D.C. Cir. 2015) (agreeing with the Fifth and Eleventh Circuits that "the question of whether a vessel is 'subject to the jurisdiction of the United States' is a matter of subject-matter jurisdiction"). "Unlike Congress's employment in other statutes of one-factor jurisdictional elements such as 'by a Federal Reserve Bank,' or 'affect[ing] interstate commerce,' the facts that may cause a vessel to be 'subject to the jurisdiction of the United States' [under the MDLEA] involve numerous complex alternatives, which are spelled out at length in § 70502 under 'Definitions.'" Prado, 933 F.3d at 149. Although appellants assert that their challenge to their prosecution implicates subject-matter jurisdiction, our precedent, as noted above, holds otherwise.

nationality, see 46 U.S.C. § 70502(c)(1)(A),[15] but the Department of State Certification that subsequently was filed specified that "the Government of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C)," Reyes-Valdivia, ECF No. 46-2, at 3 (Mar. 25, 2016) (Dep't of State Certification) (emphasis added). Appellants' plea agreements also identified § 70502(c)(1)(A) -- i.e., the subsection referring to vessels "without nationality" -- as the basis for U.S. jurisdiction, see id., ECF Nos. 68, 72, at 1-2 (Apr. 4, 2016), and the "Government's Version of the Facts," incorporated into those agreements, set forth the facts concerning the vessel's status in language tracking the requirements of § 70502(d)(1)(C): the master's claim of Costa Rican nationality and the response from the government of Costa Rica "that it could neither confirm nor refute the registry of the suspect vessel," id. at 11. The same facts were recounted by the government at the change-of-plea hearing. See id., ECF No. 117, at 26 (Oct. 3, 2016).[16] The government's Motion in Limine and Memorandum of Law

---

[15] As previously noted, § 70502(c)(1) lists "a vessel without nationality" among the list of vessels that are "subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A). Other types of vessels on the list include "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States," id. § 70502(c)(1)(C), and "a vessel in the customs waters of the United States," id. § 70502(c)(1)(D).

[16] At the plea hearing, the government was asked to "give a brief explanation of the theory to be presented to prove each

- 17 -

in Support of Jurisdiction[17] likewise asked the district court to "find, as a matter of law, that [appellants'] vessel was subject to the jurisdiction of the United States, as defined in . . . Sections 70502(c)(1)(A) and (d)(1)(C)." Id., ECF No. 46, at 4 (Mar. 25, 2016).[18]

---

Defendant guilty if a trial were to be held."  Id. at 25.  In relevant part, the prosecutor stated:

> The vessel was tracked by aircraft and eventually came to a stop.  The U.S. Coast Guard boarding team approached the vessel and commenced right of approach questioning.
> The master claimed Costa Rican nationality for the vessel but provided no registration[] paperwork, and there was no indicia of nationality on the vessel.
> The Government of Costa Rica was approached.  They responded they could neither confirm nor refute the registry of [the] suspect vessel.
> The vessel was determined to be one without nationality.

Id. at 25-26.

[17] In a 1996 amendment to the MDLEA, Congress stated that jurisdictional issues under the statute "are preliminary questions of law to be determined solely by the trial judge."  46 U.S.C. § 70504(a); see also González, 311 F.3d at 442-43.  Appellants moved to change their pleas a week after the government filed the Motion in Limine, and the district court therefore did not rule on it. See Reyes-Valdivia, ECF Nos. 59, 63 (Apr. 1, 2016).

[18] The government has continued to rely on § 70502(d)(1)(C) before us.  In its initial brief, the government quoted the provision in full and then described appellants' admission consistently with the provision's terms -- i.e., "that Costa Rica did not confirm the registry of their vessel (which had no indicia of nationality) and that their vessel was determined to be one without nationality."  Appellee's Br. at 36.  In addition, in asserting that the MDLEA provided sufficient and unambiguous notice of the MDLEA's applicability to appellants, the government

- 18 -

Appellants thus pleaded guilty based on the government's assertion of jurisdiction pursuant to § 70502(d)(1)(C), in accordance with the facts stated in their plea agreements. In other words, they admitted that they "did what the indictment alleged" and that the government accurately described the facts giving rise to U.S. jurisdiction under § 70502(d)(1)(C). Class, 138 S. Ct. at 804. Hence, their challenge to the constitutionality of § 70502(d)(1)(C) does not "contradict the terms of the indictment or the written plea agreement," and, as in Class, the constitutional claim can "be 'resolved without any need to venture beyond th[e] record.'" Id. (quoting Broce, 488 U.S. at 575). Appellants' constitutional challenge is premised on the facts set forth by the government and legal principles that, they claim, invalidate § 70502(d)(1)(C)'s definition of a "vessel without nationality" as a basis for subjecting them to U.S. jurisdiction. We need not go outside the existing record to address that question of law. Consequently, appellants' guilty pleas do not bar this direct appeal. See id. at 805.

The government also appears to argue, however, that it is entitled to sidestep appellants' claim that § 70502(d)(1)(C) is

---

stated: "The absence of an assertion by the Costa Rican government rendered the Appellants' boat a 'vessel without nationality,' [46 U.S.C.] § 70502(d)(1), and thus a 'vessel subject to the jurisdiction of the United States,' id. § 70502(c)(1)(A)." Id. at 38.

unconstitutional because, it says, their vessel could have been deemed without nationality based on other jurisdictional theories and other facts. In its supplemental brief, the government asserts that Reyes-Valdivia's failure to produce registration paperwork or otherwise substantiate his verbal claim of nationality would suffice to "render[] the vessel stateless as a matter of domestic and international law." Appellee's Supp. Br. at 9 (emphasis omitted).[19] The government further notes that the vessel could be deemed stateless because it "had no indicia of nationality other than the master's say-so, and even he presented conflicting information, having initially stated the vessel had no nationality." Id. at 11 (internal quotation marks omitted). But these jurisdictional theories are not the basis on which the government relied to arrest and prosecute appellants, and to obtain their guilty pleas. The defendants therefore had no reason or opportunity to consider those rationales for deeming their vessel stateless before deciding to forgo their right to contest the MDLEA charges,[20] which relied on the undisputed facts establishing

---

[19] This theory also plays a part in the government's defense of § 70502(d)(1)(C), and we address it in that context in Section V.C.

[20] In his supplemental brief, Reyes-Valdivia challenges the government's assertion that the vessel bore no indicia of nationality. He contends that "[p]hotos of the vessel clearly show the civil ensign of Costa Rica painted, albeit vertically, on the port and starboard sides of the ship's bow," and he points out that "the Costa Rica ensign was prominent enough for a Marine Patrol Aircraft ['MPA'] to recognize it from overhead."

statelessness under § 70502(d)(1)(C).[21]  It is now simply too late for the government to proffer alternative bases for jurisdiction. Cf. United States v. Mitchell-Hunter, 663 F.3d 45, 50 n.7 (1st Cir. 2011) (stating that jurisdiction under the MDLEA may be established "any time prior to trial" (emphasis added)).

In sum, neither of the government's waiver-of-appeal arguments has merit.

---

Appellants' Supp. Br. at 18 n.4.  The assertion of visibility from the air was based on the statement of Customs Officer Luis Rosado recounting that the MPA had detected a go-fast vessel "with a Costa Rican flag painted on the bow."  Reyes-Valdivia, ECF No. 46-1, at 1 (Mar. 25, 2016).  The government properly points out that appellants admitted in their plea agreements to a version of the facts stating that their vessel bore no indicia of nationality and argues that appellants "may not pursue any contention on appeal that 'would contradict' that admission."  Appellee's Supp. Response Br. at 5 (quoting United States v. Sarmiento-Palacios, 885 F.3d 1, 4 (1st Cir. 2018)).  However, the government, too, must abide by the facts on which it relied to obtain appellants' pleas.

[21] We also note that the government has argued, on the one hand, that "[t]he MDLEA is . . . clear about how the United States decides whether a vessel is stateless," citing 46 U.S.C. § 70502(d), Appellee's Br. at 35, but, on the other hand, has not identified a statutory provision that matches its newly offered theories of jurisdiction.  As described more fully infra, the two other circumstances for classifying a vessel as "without nationality" expressly stated in § 70502(d)(1) -- the denial of a claim by the named country and the master's refusal to make a claim upon request -- do not apply here.  See 46 U.S.C. § 70502(d)(1)(A), (B).  Although § 70502(d)(1)'s categories of stateless vessels are non-exclusive (the provision states that "the term 'vessel without nationality' includes" the three listed examples (emphasis added)), the government cannot reasonably expect defendants to assess their options if it invokes a particular statutory basis for jurisdiction but reserves the right to shift theories -- including to theories beyond the statute's express language.

- 21 -

We must consider one last issue before reaching the merits of appellants' claims. As our colleague notes in his concurrence, the jurisdictional provision relied on by the government to prosecute appellants, 46 U.S.C. § 70502(d)(1)(C), refers to a vessel master's having made a claim of <u>registry</u>, but Reyes-Valdivia claimed Costa Rican <u>nationality</u>, not registry. The parties initially appeared to agree that § 70502(d)(1)(C) nonetheless applies to the facts of this case. In a supplemental brief submitted in response to questions from the court, however, appellants argued for the first time that the provision is inapt where the master of the vessel asserts only a nationality claim.

We are unpersuaded that this distinction between a claim of registry and a claim of nationality provides a basis for vacating appellants' convictions. Although the terms "nationality" and "registry," in formal usage, are not interchangeable,[22] the MDLEA treats them as such throughout

---

[22] In general, the "nationality" of a vessel refers to the country that has certain "international rights and duties . . . in connection with a given ship and its users." Herman Meyers, <u>The Nationality of Ships</u> 129 (1967). The term "registration" refers to the recording of nationality "on land and under the supervision of a government body." <u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> at 129-30 ("The purpose of a register is to declare the nationality of a vessel engaged in trade with foreign nations, and to enable her to assert that nationality wherever found." (quoting <u>The Mohawk</u>, 70 U.S. (3 Wall.) 566, 571 (1865))).

§ 70502. Section 70502(e), for example, jointly defines a "claim of nationality or registry" to "include[] only":

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas;[23]
> (2) flying its nation's ensign or flag; or
> (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

46 U.S.C. § 70502(e). By allowing the act of flying a national flag or the possession of documents of nationality to suffice as a claim to either nationality or registry, the MDLEA effectively treats the distinction between nationality and registry as irrelevant. Congress's use of the two terms interchangeably, or at least inconsistently, is even more evident in § 70502(d)(1)(C), where the rejection of a master's claim of registry is premised on the named country's failure to confirm nationality.

Yet, this variation in terminology does not undermine what is otherwise Congress's clear intention to require verification when a master identifies a vessel as "foreign" -- whether by claiming nationality or registry -- and thereby seeks to avoid the jurisdiction possessed by the United States (and all nations) over stateless vessels. As we shall

---

[23] Article 5 states, in part, that "[e]ach State shall issue to ships to which it has granted the right to fly its flag documents to that effect." United Nations Convention on the High Seas art. 5, Apr. 29, 1958 ("1958 Convention on the High Seas"), 13 U.S.T. 2312.

explain, we think it evident that Congress used the term "claim of registry" in the first part of § 70502(d)(1)(C) to also encompass a "claim of nationality" -- a common, albeit imprecise, choice of language.

More than fifty years ago, one scholar noted the tendency to use the term registration to signify the broader concept of nationality. See Herman Meyers, The Nationality of Ships 28 (1967) (noting that "[t]he phrase 'registered in', and other word combinations in which the term register is used," are sometimes imprecisely "used as synonymous with nationality"); id. at 127 (noting that, because "in the great majority of cases" nationality and registration, along with documentation and flying the flag, "occur in combination," "the differences between the terms have sometimes been neglected and a pars pro toto [a part taken for the whole] use of the word registration . . . is by no means rare in the doctrine or in the sources of international law"). Indeed, a claim of registry is also a claim of nationality. See supra note 22. Thus, the variable word choice in § 70502(d)(1)(C) does not have the import that it might have in other contexts. See generally DePierre v. United States, 564 U.S. 70, 83 (2011) (noting the usual assumption that a legislature intends different meanings when it uses different words, but also recognizing that "Congress sometimes uses slightly different language to convey the same message").

Importantly, notwithstanding the prior reference to a claim of registry in § 70502(d)(1)(C), Congress's ultimate demand in that same provision is for confirmation of <u>nationality</u>. We can detect no reason why Congress would require affirmative confirmation when a vessel's master makes a claim of registry, while allowing a claim of nationality to stand on its own. Excluding claims of nationality from the provision's scope would allow drug traffickers to evade the verification requirement simply by asserting a claim of nationality. Appellants attribute that glaring loophole to Congress's deference to foreign nations and its intention to stay within the bounds of international law. They note that a claim of nationality "presents a more complicated scenario since not all national ships are registered," making it more difficult for the claimed nation "to confirm or refute the nationality claim." Appellants' Supp. Br. at 8-9. Appellants do not explain, however, why that concern would prompt Congress, in effect, to nullify the verification provision by encouraging vessel masters to claim foreign nationality rather than registry. Inescapably, then, the reference in the first part of § 70502(d)(1)(C) solely to "a claim of registry" must be attributable to the not infrequent practice of treating a "claim of registry" and a "claim of nationality" as essentially synonymous, even though the former term is technically narrower than the latter.

Our view that § 70502(d)(1)(C) is not reasonably construed as limited to claims of registry is reinforced when the provision is considered in the context of the MDLEA as a whole and in light of its legislative history. See, e.g., Abramski v. United States, 573 U.S. 169, 179 n.6 (2014) ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context."); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)). The MDLEA reflects Congress's intention to enable the aggressive prosecution of maritime drug trafficking. See 46 U.S.C. § 70501 ("Congress finds and declares that . . . trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States . . . ."). Indeed, § 70502(d)(1)(C) was among several provisions added to the MDLEA in 1996 to "expand the Government's prosecutorial effectiveness in drug smuggling cases." H.R. Rep. No. 104-854, at

142 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 4292, 4337. Given this statutory backdrop, the majority observed in United States v. Matos-Luchi that "Congress did not expect courts to render a cramped reading of the statute." 627 F.3d 1, 7 (1st Cir. 2010).

In addition, other portions of the MDLEA's legislative history indicate that Congress's specific reference to a claim of registry in subsections (A) and (C) of § 70502(d)(1) -- both involving the claimed nation's response (or lack thereof)[24] -- may reflect the fact that registry claims appear to have been the common way in which drug-trafficking defendants asserted their foreign nationality. There are multiple references to the difficulty faced by prosecutors in producing "judicially admissible documentary evidence" of the foreign nation's "consent [to board] or denial of a claim of registry." S. Rep. No. 99-530, at 15 (1986) (emphasis added); see also, e.g., USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before the S. Subcomm. on Merchant Marine of the Comm. on Commerce, Sci. & Transp., 99th Cong. 39-40 (1986) (Responses of Adm. James Gracey to questions

---

[24] Like § 70502(d)(1)(C), see supra note 7, subsection (d)(1)(A) specifically references a claim of registry, stating that a "vessel without nationality" includes any vessel "aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed."

from Sen. Hollings).[25]  But whatever the exact explanation for the

chosen language, given the legislative background, together with

---

[25] This hearing, in May 1986, preceded the adoption that year of the MDLEA. Asked to "describe the kinds of problems the Coast Guard and federal prosecutors have encountered" in responding to jurisdictional objections from accused drug traffickers at trial, Admiral Gracey responded, in part, as follows:

> The princip[al] problems that have arisen involve the difficulty of proving vessel status.  For [e]xample, if upon inquiry by the Coast Guard, a vessel makes a claim of registry, the U.S. must confirm that registry with the claimed flag state.  If the flag state denies registry, the vessel is stateless, i.e., a "vessel subject to the jurisdiction of the United States" . . . .  At this point, the U.S. may under international law take law enforcement action against that vessel. However, to prove the element of the offense in court, the U.S. must obtain a formal certification from the claimed flag state attesting that the vessel is not registered in that state.  On the other hand, i[f] the claimed state verifies registry, the U.S. obtains that state's consent to take law enforcement action.  . . .  However, to prove the element of the offense in court, the United States must obtain a formal certification from the flag state verifying registry and confirming its consent for the U.S. to take law enforcement action.  The difficulties in obtaining these documents from foreign governments in a timely manner, and in a form acceptable to our courts under the Federal Rules of Evidence, have been considerable.

USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before the S. Subcomm. on Merchant Marine of the Comm. on Commerce, Sci. & Transp., 99th Cong. 39-40.

A focus on registry as the common indicator of nationality also appears in the legislative history of the MDLEA's predecessor, the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat.

Congress's blending of the concepts of nationality and registry elsewhere in the MDLEA, a reading of § 70502(d)(1)(C) that excludes claims of nationality would "produce[] a substantive effect that is [in]compatible with the rest of the law." United Sav. Ass'n of Tex., 484 U.S. at 371.

We note, in addition, that this court has treated claims of registry and nationality synonymously in multiple cases. For example, in Matos-Luchi, the majority cited § 70502(d)(1)(A) and (C) -- both of which refer only to a claim of registry -- as applicable to a "claim of nationality [that] is made but rejected [(d)(1)(A)] or not backed up by the nation invoked [(d)(1)(C)]." 627 F.3d at 6; see also United States v. Cuevas-Esquivel, 905 F.2d 510, 513-14 (1st Cir. 1990) (noting the absence of a claim of nationality but citing to a provision in an earlier codification of the MDLEA that referenced only registry (46 U.S.C. App. § 1903(c)(2)(A))); United States v. Maynard, 888 F.2d 918, 925 (1st Cir. 1989) ("Since a 'claim of nationality' was made, the

1159 (1980). See, e.g., Stopping "Mother Ships" -- A Loophole in Drug Enforcement: Hearing Before the S. Subcomm. to Investigate Juvenile Delinquency of the Comm. on the Judiciary, 95th Cong., at 52 (1978) (Statement of Morris Busby, Acting Deputy Assistant Sec. of State for Oceans and Fisheries Affairs) (noting the "well-established principle under international law . . . that a country may exercise jurisdiction on the high seas over a vessel without nationality, one that is not registered in any foreign state"); id. at 53 (explaining that, when the master or crew make "a claim of nationality," the Coast Guard's protocol involves contacting the claimed flag state to "request[] that the government verify the registry of the vessel").

[vessel] can be classified as a stateless vessel only if the 'claim is denied by the flag nation whose registry is claimed.'" (quoting § 1903(c)(2)(A))).

Other courts have likewise used the terms interchangeably. See United States v. Alarcon Sanchez, 972 F.3d 156, 162-63 (2d Cir. 2020) (stating that "[a] claim of registry may be made" by "'a verbal claim of nationality or registry,'" quoting 46 U.S.C. § 70502(e) and relying on § 70502(d)(1)(C) in discussing the master's assertion of nationality); United States v. Prado, 933 F.3d 121, 130 (2d Cir. 2019) ("[A] verbal assertion of nationality by the master constitutes a claim, which is then tested by a U.S. officer's inquiry of the nation's registry authority."); United States v. Hills, 748 Fed. App'x 252, 253 (11th Cir. 2018) (per curiam) (finding that the defendant's vessel was without nationality based on § 70502(d)(1)(C) where the defendant "told [the Coast Guard] that he was the master of the vessel and identified the vessel as Costa Rican"); United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (referring to "a false claim of nationality or registry" even though the provision at issue, 46 U.S.C. App. § 1903(c)(2)(A), referred only to "a claim of registry"); id. at 174 ("[T]he prosecution can establish that a vessel is stateless by showing that the master or person in charge

made a claim of nationality or registry that was denied by the flag nation whose registry was claimed.").[26]

We therefore see no basis for departing from our prior understanding of § 70502(d)(1)(C)'s scope.[27]  Congress's reference solely to claims of registry in the first part of § 70502(d)(1)(C) is not reasonably construed to exclude from that subsection's verification requirement claims of nationality that are phrased without reference to registration.[28]

---

[26] The government in this case also blended the two concepts. Despite the claim solely of nationality, the United States asked Costa Rica to confirm "registry or nationality."  Costa Rica then "replied that it could not confirm [the] vessel's registry."  See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (Dep't of State Certification).

[27] In so concluding, we note that, contrary to appellants' assertion, the statutory imprecision here is not an instance of ambiguity requiring application of the rule of lenity.  The rule of lenity, which "requires that ambiguity in a criminal statute be resolved in favor of the accused," United States v. Jimenez, 507 F.3d 13, 20 (1st Cir. 2007), "does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose," Caron v. United States, 524 U.S. 308, 316 (1998).  As we have described, Congress clearly intended to subject a claim of nationality that is not premised on registry to the same verification requirement as a claim of registry.  Accordingly, the rule of lenity does not come into play.  See Moskal v. United States, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." (internal quotation marks omitted)).

[28] Although we do not rely on waiver in rejecting appellants' belated argument that § 70502(d)(1)(C) does not apply to the facts of this case, we note that a request for supplemental briefing does not revive a claim that a party has failed to preserve.  See United States v. Galíndez, 999 F.3d 60, 69 n.10 (1st Cir. 2021).

**V.**

Having addressed these threshold issues, we turn to appellants' constitutional challenge to 46 U.S.C. § 70502(d)(1)(C). As described above, we have construed that provision to allow U.S. authorities to deem a vessel "without nationality" -- i.e., stateless -- when a claim of either registry or nationality asserted by the vessel's occupants is neither confirmed nor denied by the claimed country. See, e.g., Matos-Luchi, 627 F.3d at 6. Under Aybar-Ulloa, a determination of statelessness has a significant consequence: it permits prosecution under U.S. law of any foreign national aboard the vessel. See 987 F.3d at 3. Appellants contend that § 70502(d)(1)(C) exceeds Congress's authority under the "Define and Punish Clause" of Article I, which gives Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10.

It is undisputed that the "vessel without nationality" provisions of the MDLEA were enacted solely pursuant to Congress's authority to "define and punish . . . Felonies committed on the high Seas" ("the Felonies Clause").[29]   See United States v.

---

[29] Although it may be more accurate to refer to the "Felonies Clause" as the "Felonies Sub-Clause," given that it is contained within the Define and Punish Clause, we use the "Felonies Clause" designation for simplicity.

- 32 -

Cruickshank, 837 F.3d 1182, 1187 (11th Cir. 2016) (stating that the MDLEA "was enacted under Congress's authority provided by the Felonies Clause"). Appellants argue that the definition of "vessel without nationality" in § 70502(d)(1)(C) conflicts with international law and thus authorizes the arrest and prosecution of foreign nationals aboard vessels on the high seas that the Constitution does not permit. This assertion of U.S. jurisdiction is incompatible with the Constitution, appellants contend, because Congress's authority under the Felonies Clause is constrained by international law. Put another way, appellants ask us to conclude that, under longstanding principles of international law, their vessel was not properly deemed stateless, and because Congress's authority in this instance is limited by international law, appellants' arrests and prosecution were unconstitutional.

We review appellants' challenge to the constitutionality of a federal statute de novo. See United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011). We begin by describing existing law on the MDLEA, and then consider the origins and meaning of the Define and Punish Clause generally, and the Felonies Clause specifically, before assessing whether § 70502(d)(1)(C) of the MDLEA violates the jurisdictional limits imposed by the Felonies Clause.

## A. Statutory Background and Overview of Case Law on the MDLEA

The MDLEA makes it unlawful for persons "on board a covered vessel . . . [to] knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). The MDLEA's prohibitions apply "even though the act is committed outside the territorial jurisdiction of the United States," id. § 70503(b), and "a covered vessel" includes, inter alia, any "vessel subject to the jurisdiction of the United States," id. § 70503(e)(1).[30] As relevant here, the Act defines "vessel subject to the jurisdiction of the United States" to include any "vessel without nationality." Id. § 70502(c)(1)(A).

A vessel is expressly considered "without nationality" -- or stateless -- under the MDLEA in three circumstances. First, that label applies when "the master or individual in charge fails," when asked by U.S. law enforcement, "to make a claim of nationality or registry for th[e] vessel." Id. § 70502(d)(1)(B). As noted above, a claim of nationality or registry can be made by presenting documents demonstrating nationality, "flying [the claimed] nation's ensign or flag," or verbally asserting nationality or

---

[30] Another subsection of the statute defines "covered vessel" to include "any other vessel if the individual [allegedly engaged in drug activity] is a citizen of the United States or a resident alien of the United States." 46 U.S.C. § 70503(e)(2). At issue in this case is U.S. jurisdiction over foreigners, and we therefore do not consider the MDLEA's application to U.S. nationals.

registry. Id. § 70502(e)(1)-(3). Second, a vessel is considered stateless if its master does make a claim of nationality or registry, but the nation identified denies the claim when contacted by U.S. officials. Id. § 70502(d)(1)(A). Third, a vessel is considered stateless when the country whose nationality is claimed "does not affirmatively and unequivocally assert that the vessel is of its nationality." Id. § 70502(d)(1)(C). This last situation -- the foundation for appellants' arrest and prosecution -- is the focus of the constitutional challenge now before us.[31]

Despite the frequency with which MDLEA cases arise in this circuit, waiver and other threshold procedural issues have prevented us from fully addressing the merits of a challenge under Article I to any portion of the MDLEA. See United States v. Sarmiento-Palacios, 885 F.3d 1, 3-4 (1st Cir. 2018) (finding a challenge to the constitutionality of the MDLEA waived where the defendant failed to develop the argument and conceded that "the MDLEA is a valid exercise of Congress's Article I powers"); United States v. Díaz-Doncel, 811 F.3d 517, 518 (1st Cir. 2016) (holding, before Class, that the defendant had waived the right to challenge the constitutionality of the MDLEA on appeal by entering an

---

[31] A vessel also may be treated as stateless under the MDLEA if it displays more than one country's flag "and us[es] them according to convenience." 1958 Convention on the High Seas, supra, art. 6 (incorporated into the MDLEA at 46 U.S.C. § 70502(c)(1)(B)).

unconditional guilty plea); United States v. Nueci-Pena, 711 F.3d 191, 196-98 (1st Cir. 2013) (addressing defendant's Article I challenge to the MDLEA under plain error review because the argument was not raised in the district court and concluding that there was no plain error in light of the lack of First Circuit and Supreme Court precedent addressing the constitutionality of the MDLEA); United States v. Cardales-Luna, 632 F.3d 731, 737-38 (1st Cir. 2011) (holding that, because the constitutionality of the MDLEA did not implicate the court's subject matter jurisdiction, it was not appropriate for the court to raise the issue sua sponte).

In Aybar-Ulloa, the en banc court was presented with a preserved constitutional challenge. The defendant argued that Article I did not give Congress the authority to assert U.S. jurisdiction over stateless vessels that have no nexus to the United States, basing his argument on the asserted existence of a nexus requirement in international law. See 987 F.3d at 15 (Barron, J., concurring) (elaborating Aybar-Ulloa's constitutional claim). The en banc court did not address Congress's authority under the Constitution, however, because it concluded that international law permits the United States to prosecute foreign nationals engaged in drug trafficking on any stateless vessel, at least when U.S. authorities have boarded and seized the vessel pursuant to the right of boarding recognized under international

law.  Id. at 6, 14.[32]  The court expressly did not "reach the question of whether the application of the MDLEA to Aybar[-Ulloa] would be constitutional were international law otherwise."  Id. at 3.  Aybar-Ulloa does not govern this case.  Unlike the defendant there -- who admitted that his vessel was stateless -- Reyes-Valdivia and Dávila-Reyes insist that their vessel was not properly deemed "without nationality."  They assert that the method of determining statelessness in § 70502(d)(1)(C) expands U.S. jurisdiction beyond the bounds permitted by the Constitution.

We have passed upon some related questions, such as whether another of the "without nationality" provisions of the MDLEA is consistent with international law, see Matos-Luchi, 627 F.3d at 6-7 (noting that 46 U.S.C. § 70502(d)(1)(B) is consistent

_____

[32] The concurring judge in Aybar-Ulloa declined to join the majority's approach, finding "no clear support in either case law or commentary for the comparatively modest proposition that persons on stateless vessels that a foreign country's officials have seized and boarded pursuant to their recognized right to visit it are subject to that country's territorial jurisdiction under international law."  987 F.3d at 18 (emphasis added).  More particularly, the Aybar-Ulloa concurrence observed that international law experts have "long noted the disagreement that exists over" whether "the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the vessel's occupants as it acquires over the vessel itself."  Id. at 17.  Given this lack of support for the majority's approach, and related concerns, see id. at 20-22, the concurring opinion instead rejected Aybar-Ulloa's challenge based on "the more than two-century-old precedent" addressing "the United States' power to prosecute defendants of a range of citizenships and circumstances" "for their felonious conduct on stateless vessels in international waters."  Id. at 22, 26 (relying on United States v. Holmes, 18 U.S. (5 Wheat.) 412 (1820)).

with international law allowing a vessel to be deemed stateless if the master refuses to claim a nationality),[33] and whether the MDLEA's flag-nation consent provisions provide due process, see Cardales, 168 F.3d at 553 (holding that "due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel").  Along with Aybar-Ulloa, these cases provide a useful backdrop to our discussion of the constitutionality of § 70502(d)(1)(C), but they do not answer the question now before us.

Although several of our sister circuits have addressed whether the MDLEA is, in general, a constitutional exercise of Congress's authority under the Felonies Clause, it appears that no circuit has considered the specific authority for § 70502(d)(1)(C)'s definition of a "vessel without nationality." Instead, courts have assumed that the MDLEA applies only to vessels that would be subject to U.S. jurisdiction under international

---

[33] In Matos-Luchi, the panel majority made the broad statement that "the MDLEA is consistent with international law."  627 F.3d at 6.  Read in context, however, that statement refers only to the jurisdictional provision at issue there -- § 70502(d)(1)(B).  The discussion that follows focuses on deeming a vessel stateless when there is an attempt "to avoid national identification," and concludes by asserting that "the instances specified by Congress -- pertinently, the refusal 'aboard' the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B) -- are not departures from international law but merely part of a pattern consistent with it."  Id. at 7 (emphasis added).

law, i.e., U.S. vessels and those meeting the international law definition of statelessness. See, e.g., United States v. Ballestas, 795 F.3d 138, 146-47 (D.C. Cir. 2015) (holding that Congress had authority under the Felonies Clause to punish a defendant for conduct committed by his co-conspirators aboard a stateless vessel on the high seas); United States v. Campbell, 743 F.3d 802, 810 (11th Cir. 2014) (stating that "we have long upheld the authority of Congress to 'extend[] the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances'" (quoting United States v. Marino-Garcia, 679 F.2d 1373, 1383 (11th Cir. 1982)) (alteration in original)); United States v. Estupinan, 453 F.3d 1336, 1338 (11th Cir. 2006) (holding that the MDLEA's punishment of drug trafficking "on board a vessel subject to the jurisdiction of the United States" is within Congress's constitutional authority); United States v. Moreno-Morillo, 334 F.3d 819, 824 (9th Cir. 2003) (citing United States v. Davis, 905 F.2d 245, 248 (9th Cir. 1990), for the proposition that "this court clearly has held that the MDLEA is constitutional" in a case where the statelessness of the vessel was uncontested). We have thus found no precedent squarely addressing the argument that appellants make here: that the definition of a "vessel without nationality" in § 70502(d)(1)(C) is broader than the definition of

a stateless vessel under international law and is therefore unconstitutional.[34]

Thus, although we draw on prior cases addressing the constitutionality of the MDLEA and its relationship with international law, the issue before us appears to be one of first impression for the federal courts.

## B. Constitutional Limits on Congress's Authority to Define and Punish Felonies

As described above, appellants contend that § 70502(d)(1)(C) of the MDLEA defines "vessel without nationality" to encompass vessels -- including their own -- that are not in fact without nationality under international law. A conflict exists, they explain, because the provision treats a vessel as

---

[34] Although the same MDLEA provision was at issue in United States v. Bravo, the defendants argued only that their prosecution was flawed because the government failed to satisfy a nexus requirement -- i.e., "that the marijuana transported in the vessel would affect the United States." 489 F.3d 1, 7 (1st Cir. 2007). We rejected the challenge, stating that "[w]e do not read the MDLEA to require a jurisdictional nexus." Id. Hence, we were not confronted with the argument asserted here -- that Congress acted beyond its constitutional authority in adopting § 70502(d)(1)(C). We note that the author of Bravo subsequently rejected the position taken in that case. See United States v. Trinidad, 839 F.3d 112, 116 (1st Cir. 2016) (Torruella, J., dissenting) ("I can no longer support the approach taken by this and our sister circuits in embracing the sweeping powers asserted by Congress and the Executive under the [MDLEA.]"). Trinidad also involved § 70502(d)(1)(C), but the defendant there did not challenge the government's determination that his vessel was "without nationality" under that provision or argue that "his plea agreement must be vacated because Congress exceeded its constitutional authority under Article I in enacting the MDLEA." Id. at 113 n.1.

stateless despite a claim of nationality being made through a method long acceptable under international law -- specifically, in their case, the master's verbal claim -- if the named country does not "affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C). In other words, appellants maintain that § 70502(d)(1)(C) rejects a claim of nationality in circumstances where international law accepts the claim. According to appellants, because of this disconnect between the MDLEA and international law, U.S. authorities who rely on the definition of a "vessel without nationality" contained in § 70502(d)(1)(C) will impermissibly arrest and prosecute foreign nationals on a foreign vessel -- which is what they say occurred in this case.

Appellants' assertion of improper arrest and prosecution depends on two propositions involving international law: first, that Congress's authority to "define and punish . . . Felonies committed on the high Seas," U.S. Const. art. I, § 8, cl. 10, is limited by principles of international law and, second, that § 70502(d)(1)(C) allows the United States to deem vessels stateless even when they would not be deemed stateless under international law. If both propositions are correct, § 70502(d)(1)(C) would unconstitutionally permit U.S. authorities to assert jurisdiction over vessels that would not be stateless under international law. In that scenario, the United States would

- 41 -

be imposing its law on foreign individuals on foreign vessels -- an extension of jurisdiction that ordinarily is impermissible. See, e.g., Aybar-Ulloa, 987 F.3d at 5 (noting that "the flag-state system guarantees freedom of navigation in international waters, as states generally may not interfere with the passage on the high seas of ships lawfully flying the flag of another state" (citing Richard A. Barnes, "Flag States," in The Oxford Handbook on the Law of the Sea 313 (Rothwell et al. eds. 2015))); id. at 12 (noting "the presumption of exclusive flag-state jurisdiction" over vessels with identified nationality).

Hence, resolving this case requires us first to examine the intersection between the Felonies Clause and international law. To be clear, the claim here is not that international law itself constrains Congress's authority to enact statutes.[35] Rather, appellants contend that the Felonies Clause of the Constitution, by original design, requires Congress to adhere to the jurisdictional limits of international law with respect to

---

[35] The MDLEA states that a person charged under the statute "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." 46 U.S.C. § 70505. The provision further states that "only . . . a foreign nation" may raise such a claim and that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter." Id. This bar does not apply here precisely because defendants are not arguing that international law itself constrains Congress's authority.

determining statelessness.[36]   We thus begin our discussion by examining how the Framers would have understood the authority given to Congress by the Felonies Clause.

### 1.   The Constitution and International Law

The delegates who gathered to draft the Constitution had a primary goal of improving the new nation's ability to meet its obligations to other countries under international law.  See Ryan Goodman & Derek P. Jinks, Filartiga's Firm Footing: International Human Rights and Federal Common Law, 66 Fordham L. Rev. 463, 464 (1997) ("[T]he Framers held the Constitutional Convention in large part due to the perceived inability of the Confederation to uphold American obligations under international law.").[37]   When the Governor of Virginia, Edmund Randolph, introduced the "Virginia Plan" that was to become the basis for the Constitution,[38] he

---

[36] Of course, where possible, we construe statutes to be consistent with international law.  See Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118 (1804); Garcia v. Sessions, 856 F.3d 27, 41 (1st Cir. 2017).

[37] In Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), the Second Circuit held that plaintiffs could bring actions under the Alien Tort Statute ("ATS") "based on modern human-rights laws absent an express cause of action created by an additional statute."  Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1398 (2018). The plaintiffs in Filartiga were the family members of a young man who had been tortured and murdered by Paraguayan police officers, one of whom was living in New York.  The suit was filed in the United States District Court for the Eastern District of New York, and the appeals court found jurisdiction existed under the ATS.

[38] The Virginia Plan was a set of fifteen "republican Principles" introduced by Randolph for discussion at the Constitutional Convention.  1 Records of the Federal Convention of

criticized the Articles of Confederation because they did not allow the federal government to punish states that "act[] against a foreign power contrary to the laws of nations or violate[] a treaty" or to compel states to punish their citizens who violate the law of nations by, for example, "invad[ing]" the rights of an ambassador. 1 Records of the Federal Convention of 1787 24-25 (Max Farrand ed., 1911) (hereinafter "Farrand's Records"). Likewise, James Madison wrote to James Monroe in 1784 that "[n]othing seems to be more difficult under [the Articles of Confederation] than to impress on the attention of our [state] Legislatures a due sense of those duties which spring from our relations to foreign nations." Letter from James Madison to James Monroe (Nov. 27, 1784), in 2 The Writings of James Madison 93 (Gaillard Hunt ed., 1901).

These statements reflect the Framers' concern that, without the power to "enforce national treaties against recalcitrant states, compel their compliance with the law of

_____

1787 27-28 (Max Farrand ed., 1911). It described in general terms the governmental structure that was later adopted in significant part by the Constitution: a bicameral legislature, a national executive (albeit one elected by the legislature), and a judiciary with, among other powers, the authority to "determine Piracies, Captures, [and] Disputes between Foreigners and Citizens." Id. Before introducing this plan, Randolph listed five ways in which the Articles of Confederation did not fulfill "the objects for which it was framed." Id. at 24. The first of these, as explained above, was its failure to ensure compliance with international law. Id. at 24-25.

nations, punish offenses against that law, regulate foreign commerce, and so on, the new republic would be unable to obtain commercial advantages and, given its military weakness and perilous geographic situation, would face external threats." David M. Golove & Daniel J. Hulsebosch, A Civilized Nation: The Early American Constitution, the Law of Nations, and the Pursuit of International Recognition, 85 N.Y.U. L. Rev. 932, 980 (2010); see also id. at 934-35 (explaining that "[d]iplomatic frustrations resulting from state violations of the Treaty of Peace [with England], in particular, helped create the atmosphere of crisis that motivated profederal forces to organize and write a constitution").

In drafting a new constitution, the Framers thus aimed "to provide a national monopoly of authority in order to assure respect for international obligations." Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 829 (1989). The Framers were "commit[ted] to protecting sovereign interests through rigorous enforcement of the law of nations." Douglas J. Sylvester, International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations, 32 N.Y.U. J. Int'l L. & Pol. 1, 9 (1999); see also Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1417 (2018) (Gorsuch, J., concurring) ("[W]hen the framers gathered to write the Constitution they included among their chief priorities endowing the national government with

sufficient power to ensure the country's compliance with the law of nations."); Golove & Hulsebosch, supra, at 988 (stating that the Framers "carefully designed the new Constitution to ensure that the new nation would uphold its duties under the law of nations"); Louis Henkin, Foreign Affairs and the United States Constitution 234 (2d ed. 1996) ("The Framers assumed that the new federal government would carry out the obligations of the United States under international law."); Anthony J. Bellia Jr. & Bradford R. Clark, The Law of Nations as Constitutional Law, 98 Va. L. Rev. 729, 751 (2012) ("Of all the rights that can belong to a nation, sovereignty is, doubtless, the most precious, and that which others ought the most scrupulously to respect, they would not do it an injury." (quoting 1 Emmerich de Vattel, The Law of Nations, bk. II, § 54, at 138 (London, J. Newberry et al., 1759), "the most well-known work on the law of nations in England and America at the time of the Founding," id. at 749)); Beth Stephens, The Law of Our Land: Customary International Law as Federal Law after Erie, 66 Fordham L. Rev. 393, 397 (1997) (stating that "the intent of the framers, incorporated into the Constitution, was to ensure respect for international law by assigning responsibility for enforcement of that law to the three branches of the federal government"). Laws governing interactions on the high seas were of particular concern: "The framers of the Constitution were familiar with [the law of the sea] and proceeded with it in mind.

Their purpose was not to strike down or abrogate the system, but to place the entire subject . . . under national control, because of its intimate relation to navigation and to interstate and foreign commerce." Panama R. Co. v. Johnson, 264 U.S. 375, 386 (1924).

The Framers' commitment to international law principles was both pragmatic and ideological. See Jay, supra, at 822 (explaining that, "[i]n the eighteenth century a consensus existed that the law of nations rested in large measure on natural law," and thus the Framers viewed following the law of nations as a moral imperative); Beth Stephens, Federalism and Foreign Affairs: Congress's Power to "Define and Punish . . . Offenses Against the Law of Nations", 42 Wm. & Mary L. Rev. 447, 465 (2000) (describing the Framers' belief that "[e]nforcement of international law norms was . . . a moral obligation"). Indeed, the Framers believed that to be a "nation," the United States must honor the law of nations.[39]

_____

[39] At the time of the founding, the phrase "law of nations" was generally used to refer to customary international law (i.e., law established by universal practice rather than by agreement in a treaty). See United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1251 (11th Cir. 2012) (stating that "[w]e and our sister circuits agree that the eighteenth-century phrase, the 'law of nations,' in contemporary terms, means customary international law," and collecting cases). However, it was also used as a broader term for international law, including treaties. See Sarah H. Cleveland & William S. Dodge, Defining and Punishing Offenses under Treaties, 124 Yale L.J. 2202, 2206-07 (2015) (arguing that "Offences against the Law of Nations" includes treaty violations). In this case, where no treaty is at issue, we need not consider the precise meaning of the term "law of nations" as used by the Framers, and

See Chief Justice John Jay, Charge to the Grand Jury of the District of New York (Apr. 4, 1790), reprinted in N.H. Gazette (Portsmouth 1790) (stating, in a charge to a grand jury, that "[w]e had become a nation -- as such, we were responsible to others for the observance of the Laws of Nations").  Hence, as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations.  See Aybar-Ulloa, 987 F.3d at 26 (Barron, J., concurring) ("The founding generation was attentive to the strictures of the law of nations.").

With this backdrop, we think it apparent that the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations.  As John Quincy Adams explained, "[t]he legislative powers of Congress are . . . limited to specific grants contained in the Constitution itself, all restricted on one side by the power of internal legislation within the separate States, and on the other, by the laws of nations."  John Quincy Adams, The Jubilee of the Constitution 71 (1839) (emphasis added).

we henceforth use the modern term "international law" to refer to the body of law that includes both customary international law and treaties.

There is a particular justification for interpreting the Define and Punish Clause in relation to the Framers' understanding of international law principles. The Define and Punish Clause, of which the Felonies Clause is a part, refers to "Offences against the Law of Nations," "Piracies," and "Felonies" -- all concepts taken directly from international law. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 451 & n.13 (1964) (White, J., dissenting) (noting that the language of the Define and Punish Clause shows the Framers' belief that "the law of nations is a part of the law of the land"); Golove & Hulsebosch, supra, at 1009 (stating that "[t]his deliberate borrowing suggest[s] that the established principles of the law of nations might define the scope of the [congressional] powers themselves"). These phrases, found in the leading international law treatises of the day, were familiar shorthand for complex international law concepts. Their use in the Constitution is thus strong evidence that the Framers intended the Define and Punish Clause to align with the international law understanding of those terms. See 3 Emmerich de Vattel, The Law of Nations 295 (1758) (Charles G. Fenwick trans., 1916) (referencing "offenses against the Law of Nations"); 4 William Blackstone, Commentaries *67-71 (discussing "offences against the law of nations," and defining "piracy" as one such offense); 3 Sir Edward Coke, The Institutes of the Laws of England

111 (1644) (describing "Piracies, and felonies . . . done on the sea").

International law thus informs our inquiry into the meaning of the Define and Punish Clause and, specifically, the Felonies portion of the Clause.

## 2. The Meaning of the Felonies Clause

As noted above, the Define and Punish Clause grants Congress the following authority: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. We discuss below primarily the text that precedes the comma -- i.e., the authority with respect to "Piracies and Felonies committed on the high Seas." That is so because, as we have noted, it is undisputed in this case that the MDLEA was enacted pursuant to Congress's authority under the Felonies Clause. Although the reference to "Piracies" -- a crime "committed on the high Seas" and appearing alongside the term "Felonies" -- necessarily plays a role in our analysis, the separate clause referencing "Offences against the Law of Nations," which applies to crimes committed both on land and at sea, sheds no light on the scope of U.S. jurisdiction on the high seas. We therefore focus solely on the authority specifically given to Congress over crimes "on the high Seas."

That focus requires us to determine what the Framers intended by the words they chose. In so doing, we seek guidance

on the Framers' understanding of international law principles, including international law terminology, from contemporaneous sources. See U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 461-62 & n.12 (1978) (explaining the Framers' separate use of the terms "treaty," "compact," and "agreement" in Article I of the Constitution by reference to treatises on international law with which the Framers would have been familiar); Waring v. Clarke, 46 U.S. 441, 441 n.1 (1847) (stating that "[t]he Constitution . . . refers to the law of nations for the meaning of" the terms "admiralty" and "maritime," and thus interpreting those terms in light of their meaning in international law); see also Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 12 (2015) (looking to "prominent international scholars" from "the time of the founding" to elucidate the meaning of the Reception Clause, Article II, section 3, of the Constitution).

Just as it does today, at the time the Framers were drafting the Constitution the term "Felonies" meant serious crimes, such as treason, murder, arson, burglary, robbery, and rape. See Blackstone, supra, at *94; 2 Timothy Cunningham, A New and Complete Law Dictionary 23-28 (3d ed. 1783). Before the Constitution became the governing law, all such crimes, whether committed on land or at sea, were defined by state statutes or state common law and punished in state courts. In the only statement at the Constitutional Convention regarding the inclusion

of the term "Felonies," James Madison explained that, "[i]f the laws of the states were to prevail on [the meaning of "Felonies"], the citizens of different states would be subject to different punishments for the same offence at sea.  There would be neither uniformity nor stability in the law."  5 Debates on the Federal Constitution 437 (Jonathan Elliot ed., 2d ed. 1836).  As voiced by Madison, then, the constitutional drafters recognized the need to create a uniform system of crimes and punishments on the high seas that would apply to all U.S. citizens.  There was no mention, however, of conduct committed by foreigners on foreign vessels.

Nonetheless, the independent inclusion of "Piracies" in the Define and Punish Clause provides a clue to the Framers' intent regarding U.S. jurisdiction over felonies committed on foreign vessels.  The separate references to "Piracies" and "Felonies" inescapably reflects the Framers' view that Congress's power over each category was meant to be distinct.  See generally The Federalist No. 42, at 233 (James Madison) (E.M. Scott ed., 1898) (discussing the necessity of defining each term).  That distinction has its origin in international law.

Piracy, as defined by international law -- i.e., "robbery upon the sea," United States v. Smith, 18 U.S. 153, 162

- 52 -

(1820)[40] -- is a crime of "universal jurisdiction,"[41] meaning that it can be punished by any country no matter where it is committed or by whom.  At the time the Constitution was drafted, this feature of piracy under international law was well established.  See

---

[40] A more expansive definition of the universal crime of piracy, updated to include the realm of aviation, is as follows:

> Piracy includes any illegal act of violence, detention or depredation committed for private ends by the crew or passengers of a private ship (or aircraft) against another ship (or aircraft) or persons or property on board it, on (or over) the high seas[.]

R.R. Churchill & A.V. Lowe, The Law of the Sea 209-10 (3d ed. 1999).

[41] As stated in modern international law, the doctrine of universal jurisdiction provides that "a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens."  Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting); see also Restatement (Third) of Foreign Relations Law of the United States § 404 (1987) (noting that "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern," even where there is no nexus between the offense and the state).  Crimes may be universal jurisdiction offenses if they are "contrary to a peremptory norm of international law" and are "so serious and on such a scale that they can justly be regarded as an attack on the international legal order."  Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.228 (quoting Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes under International Law 178-79 (Stephen Macedo ed., 2004)).  At present, in addition to piracy, the crimes generally recognized as subject to universal jurisdiction are the "slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism."  See Restatement (Third) of Foreign Relations Law of the United States § 404.  Drug trafficking is not recognized as a universal jurisdiction crime.  Aybar-Ulloa, 987 F.3d at 14.

Blackstone, supra, at *71 (stating that "every community has a right" to punish piracy because it "is an offense against the universal law of society"); 1 James Kent, Commentaries on American Law 174 (1826) (stating that "piracy, under the law of nations, is an offence against all nations, and punishable by all").  As Justice Story explained in an early piracy case:

> Pirates may, without doubt, be lawfully captured on the ocean by the public or private ships of every nation; for they are, in truth, the common enemies of all mankind, and, as such, are liable to the extreme rights of war. And a piratical aggression by an armed vessel sailing under the regular flag of any nation may be justly subjected to the penalty of confiscation for such a gross breach of the law of nations.

The Marianna Flora, 24 U.S. (11 Wheat.) 1, 40-41 (1825); see also Cardales-Luna, 632 F.3d at 741 (Torruella, J., dissenting) ("Until recently, piracy was the only crime which was punishable by all nations . . . ."); United States v. Yousef, 327 F.3d 56, 104 (2d Cir. 2003) ("The class of crimes subject to universal jurisdiction traditionally included only piracy.").

That the Framers understood the term "Piracies" to refer to the specific offense subject to universal jurisdiction is supported by their statements describing piracy as a term borrowed from international law.  For example, at the Virginia Convention, James Madison explained that "Piracies" was "[a] technical term of the law of nations." 3 Farrand's Records, supra, at 332.  Thus, by

separating the term "Piracies" from "Felonies," the Framers plainly intended to refer to the specific crime that, under international law, could be punished by Congress even when it was committed by foreign nationals on foreign vessels.

Just as plainly, then, the phrase "Felonies committed on the high Seas" was intended to reference other types of serious crimes committed on vessels. At the time, it was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law. See Blackstone, supra, at *71 (describing acts that would be punished as felonies only if committed by an English "subject" at sea); Letter from Thomas Jefferson to Edmond Charles Genet (June 17, 1793) (explaining that a country's jurisdiction over crimes such as murder "on the high seas . . . reaches its own citizens only"); William Rawle, A View of the Constitution of the United States of America 107 (2d ed. 1829) (explaining that Congress's power to punish felonies applies to anyone "except the citizens or subjects of a foreign state sailing under its flag," but that piracy is "punishable in our courts, and in the courts of all nations" (emphasis added)); Henry Wheaton, Elements of International Law 164 (Richard Henry Dana, Jr., ed., 8th ed. 1866) (observing that countries could enact laws punishing conduct at

sea, but such conduct could "only be tried by that State within whose territorial jurisdiction" or "on board of whose vessels, the offence thus created was committed").

Confusingly, these other serious crimes, which would be denominated felonies if committed on land, were often referred to as "piracies" when committed on the high seas, even though they were not "Piracy" as defined by international law. See Wheaton, supra, (explaining that "[t]here are certain acts which are considered piracy by the internal laws of a State, to which the law of nations does not attach the same signification"); Hon. John Marshall, Speech Delivered in the House of Representatives (Mar. 7, 1800), at 10 ("A statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation."); Kent, supra, (explaining that, under international law, "[t]he statute of any government may declare an offence committed on board its own vessels to be piracy, and such an offence will be punishable exclusively by the nation which passes the statute"). As one scholar explains, the term piracy "had a popular meaning of serious or capital offense on the high seas," Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. L. Rev. 149, 166 (2009), and the term was thus used colloquially to refer to any felony committed at sea, see John Marshall Speech at 10 ("It is by confounding general

piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offences committed on the high seas.").

The Framers' separation of "Piracies" and "Felonies" in the Define and Punish Clause avoids this confusion and reserves the precise meaning of "Piracy" under international law for that specific crime. The Framers' use of the separate terms "Piracies" and "Felonies" thus manifests an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S. nationals[42] or on vessels subject to U.S. jurisdiction under international law. As noted in the Aybar-Ulloa concurrence, "the United States itself early on took the position before the Supreme Court that the Define and Punish Clause" "is

---

[42] As stated supra, we do not address here the MDLEA's application to U.S. citizens and resident aliens. However, the sources quoted above indicate that the Framers would have understood the Felonies Clause to permit U.S. authorities to exercise jurisdiction over U.S. nationals on foreign vessels in at least some circumstances. See Skiriotes v. Florida, 313 U.S. 69, 73 (1941) (stating that "the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed"); United States v. Kaercher, 720 F.2d 5, 5 (1st Cir. 1983) (per curiam) (quoting the Restatement of Foreign Relations Law of the United States for the proposition that "[a] state has jurisdiction to prescribe a rule of law . . . attaching legal consequences to conduct of a national of the state wherever the conduct occurs" (alteration and omission in original)).

impliedly limited by the law of nations in ways that constrain Congress's authority to rely on that Clause to subject foreign nationals to our criminal laws for conduct that they engage [in] while they are on foreign vessels -- even when those vessels are on the high seas." 987 F.3d at 16 n.7, 15 (Barron, J., concurring); see id. at 16 n.7 (quoting the argument of Mr. Blake on behalf of the United States in United States v. Palmer, 16 U.S. (3 Wheat.) 610, 620 (1818): "A felony, which is made piracy by municipal statutes, and was not such by the law of nations, cannot be tried by the courts of the United States, if committed by a foreigner on board a foreign vessel, on the high seas; because the jurisdiction of the United States, beyond their own territorial limits, only extends to the punishment of crimes which are piracy by the law of nations.").

### 3. Jurisdiction on the High Seas under International Law

Given the Framers' clear intention to draw a jurisdictional distinction between "Piracies" and "Felonies," the question of when a vessel sailing on the high seas may be subject to U.S. jurisdiction under international law -- i.e., the question at the heart of this case -- has constitutional significance. It is a bedrock principle of the international law of the sea, recognized long before the founding of this country, that "all nations have an equal and untrammelled right to navigate on the high seas." Marino-Garcia, 679 F.2d at 1380; see also United

States v. Maine, 475 U.S. 89, 96 n.11 (1986) (explaining that "since the days of Grotius, the principle of the freedom of the high seas found an ever wider currency" and "crystallized into a universally accepted principle of international law" by "the beginning of the nineteenth century" (quoting Yehuda Z. Blum, Historic Titles in International Law § 61, at 242-43 (1965))); Hugo Grotius, The Freedom of the Seas 44 (Ralph V.D. Magoffin trans., 1916) ("It is clear . . . that he who prevents another from navigating the sea has no support in law."); United Nations Convention on the Law of the Sea ("UNCLOS") art. 90, Dec. 10, 1982, 1833 U.N.T.S. 397.[43]  To ensure this right of free navigation,

---

[43] Although the Senate has not ratified the UNCLOS, it was signed by the President and is generally recognized by the United States as reflecting customary international law, i.e., universal practice.  See United States v. Alaska, 503 U.S. 569, 588 n.10 (1992) (acknowledging the U.S. government's position that the UNCLOS provisions are part of customary international law); see also Aybar-Ulloa, 987 F.3d at 5 n.2 (citing the UNCLOS "as evidence of the customs and usages of international law"); United States v. Hasan, 747 F. Supp. 2d 599, 635 (E.D. Va. 2010) ("[T]he United States has consistently accepted UNCLOS as customary international law for more than 25 years.").  Moreover, "many of the provisions of the [UNCLOS] follow closely provisions in the 1958 conventions to which the United States is a party and which largely restated customary law as of that time."  Restatement (Third) of Foreign Relations Law of the United States, Part V, Introductory Note; see also Mayagüezanos por la Salud y el Ambiente v. United States, 198 F.3d 297, 304 n.14 (1st Cir. 1999) (referring to the "UNCLOS only to the extent that it incorporates customary international law," and noting that, as a signatory, "the United States 'is obliged to refrain from acts that would defeat the object and purpose of the agreement'" (quoting Restatement (Third) of Foreign Relations Law of the United States § 312(3))).  The UNCLOS provisions defining a stateless vessel discussed infra have long been part of the international law of the sea and are largely identical to those in

"international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas," and "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly."[44]  Marino-Garcia, 679 F.2d at 1380; see also Aybar-Ulloa, 987 F.3d at 5; John Marshall Speech at 5 (stating that "the opinion of the world is, that a fleet at sea, is within the jurisdiction of the nation to which it belongs").

To preserve this system of flag-state jurisdiction, "every vessel must sail under the flag of one and only one state; those that sail under no flag . . . enjoy no legal protection." Matos-Luchi, 627 F.3d at 5; see also, e.g., Aybar-Ulloa, 987 F.3d at 6 (noting that "international law renders stateless vessels 'susceptible to the jurisdiction of any State'" (quoting Barnes, supra, at 314)); United States v. Pinto-Mejia, 720 F.2d 248, 260 (2d Cir. 1983) (explaining that "a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity"); United States v. Rubies, 612 F.2d 397, 403 (9th Cir. 1979) ("'In

the 1958 Convention on the High Seas, which has been ratified by the United States.  See supra, arts. 5 & 6.

[44] Although the nationality of a vessel is often referred to as its "flag," there is no requirement that a vessel fly a physical flag to maintain its nationality.  See Matos-Luchi, 627 F.3d at 5. Rather, "[s]hips have the nationality of the State whose flag they are entitled to fly." UNCLOS art. 91, § 1 (emphasis added).

the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.'" (quoting Lassa Oppenheim, International Law 546 (7th ed. 1948))). Therefore, it has long been understood that the United States -- and any other country -- may exercise jurisdiction over vessels that are considered stateless under international law. We confirmed that understanding in Aybar-Ulloa. See, e.g., 987 F.3d at 12 ("[S]tateless vessels are treated as subject to the exercise of authority by any nation."); see also, e.g., Matos-Luchi, 627 F.3d at 6 (noting that "international law . . . treats the 'stateless vessel' concept as informed by the need for effective enforcement," and, hence, "a vessel may be deemed 'stateless,' and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia of nationality and seeks to avoid national identification"); Andrew W. Anderson, Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 337 (1982) ("[T]he extension of United States jurisdiction over stateless vessels seems not only to be a reasonable claim but completely consistent with both customary and treaty international law.").

These general principles of jurisdiction on the high seas are not disputed in this case, and, indeed, the Supreme Court applied these principles in the decades immediately following the Constitution's adoption. In 1790, Congress passed a law making murder and robbery committed by "any person" on the high seas punishable under U.S. law. See Palmer, 16 U.S. (3 Wheat.) at 626. It was an open question, however, whether the statute extended to conduct by foreigners on foreign vessels. When he was a congressman, John Marshall argued that the Define and Punish Clause

> can never be construed to make to the government a grant of power, which the people making it, did not themselves possess. It has already been shown that the people of the United States have no jurisdiction over offences, committed on board a foreign ship, against a foreign nation. Of consequence, in framing a government for themselves, they cannot have passed this jurisdiction to that government.

John Marshall Speech at 24-25.

Not surprisingly, then, the Supreme Court in United States v. Palmer, in an opinion written by now Chief Justice Marshall, held that the statute did not extend U.S. jurisdiction to foreigners on foreign vessels for the common law form of robbery, as distinguished from classic piracy. See 16 U.S. (3 Wheat.) at 630-34. The Court reiterated its holding on the statute's reach two years later, concluding that it did not criminalize the murder of a foreigner on a foreign vessel on the

high seas because Congress knew it "had no right to interfere" in such cases.  Furlong, 18 U.S. (5 Wheat.) at 198; see also id. at 197 (observing that "punishing [murder] when committed within the jurisdiction, or, (what is the same thing,) in the vessel of another nation, has not been acknowledged as a right, much less an obligation").  By contrast, the Supreme Court recognized the classic form of piracy as "a crime within the acknowledged reach of the punishing power of Congress" even when "committed by a foreigner upon a foreigner in a foreign ship," id. at 197, and noted in other cases that "[m]urders committed by and against foreigners on stateless vessels . . . could be prosecuted in the United States," Aybar-Ulloa, 987 F.3d at 7 (citing United States v. Klintock, 18 U.S. (5 Wheat.) 144, 151 (1820) and United States v. Holmes, 18 U.S. (5 Wheat.) 412, 417-18 (1820)).[45]

Thus, in light of these well-established limitations on Congress's ability to criminalize the conduct of foreign nationals

---

[45] As noted above, the concurring opinion in Aybar-Ulloa also reports the historical support, in caselaw and commentary, for the contention that Congress lacks authority under the Define and Punish Clause to punish foreign nationals for conduct committed on foreign vessels, "even when those vessels are on the high seas." 987 F.3d at 15-16 & n.7 (Barron, J., concurring); see also id. at 22-26 (discussing the cases "decided just decades after the Constitution's ratification" that "dealt with the United States' power to prosecute defendants of a range of citizenships and circumstances who shared the attribute of having been indicted in our country pursuant to our criminal justice system for murder, robbery, or other wrongdoing on the high seas").

aboard foreign vessels on the high seas,[46] the question that arises when the United States seeks to impose its law on foreigners on the high seas is how to identify a vessel that is not within any other country's jurisdiction -- potentially exposing those aboard to _every_ country's jurisdiction.[47]  In other words, when may a vessel be characterized as stateless?  Stateless vessels do not appear to have been a primary focus at the time of the Framers, and we have found no explicit statements in their deliberations on when a vessel should be deemed stateless.  That silence, of course, is unsurprising, given the focus on avoiding improper intrusions into the affairs of foreign nations.

As we have concluded, however, there can be no doubt that the Constitution's drafters intended that Congress's

---

[46] There are, of course, exceptions to the broad principle that Congress cannot extend U.S. criminal jurisdiction to crimes like common law robbery or murder committed by foreigners against foreigners on foreign vessels.  For example, a country may prosecute such crimes with the consent of the foreign nation.  _See_ _Matos-Luchi_, 627 F.3d at 7; _see_ _also_ 46 U.S.C. § 70502(c)(1)(C). But these exceptions are not pertinent here.

[47] We use the word "potentially" because we declined in _Aybar-Ulloa_ to decide "whether the United States may prosecute a foreign citizen engaged in drug trafficking on a stateless vessel where the United States never boarded and seized the vessel."  987 F.3d at 14.  We note, in addition, the observation in the _Aybar-Ulloa_ concurrence that the Third and Fourth Restatements of Foreign Relations Law of the United States do not "establish that the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the [stateless] vessel's occupants as it acquires over the vessel itself."  _Id._ at 17 (Barron, J., concurring).

authority under the Define and Punish Clause, including the Felonies portion of it, be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas. The Framers sought to ensure that Congress would respect the sovereignty of other nations, and the limits placed on the prosecution of other countries' nationals is an essential component of the international system of mutual respect. Necessarily, then, that constraint applies when Congress passes legislation deeming vessels on the high seas stateless. If the Constitution instead permitted Congress to define a vessel as stateless in any way it wished, there would be a risk that Congress could contravene international norms determining when a country may prosecute felonies committed by foreign nationals on the high seas. It therefore follows that the Felonies Clause requires Congress to abide by international law principles in defining statelessness. We thus review those principles.

### 4. Statelessness under International Law

International law allows each nation to decide for itself the process through which it will grant its nationality to a vessel. See Lauritzen v. Larsen, 345 U.S. 571, 584 (1953) ("Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring

- 65 -

authority over it."); UNCLOS art. 91, § 1 ("Every State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag."); 5 J.H.W. Verzijl, International Law in Historical Perspective 146 (1972) (describing an 1801 proclamation by the King of England regarding the conditions under which merchant ships may fly the British flag, and noting "[t]he general principle . . . that it is within the domestic jurisdiction of any State . . . to determine on what conditions it will allow a sea-going vessel to fly its flag and thus grant her its 'nationality'"). The simplest definition of a stateless vessel under international law is thus a vessel that has not been granted nationality by any state.   Pursuant to that definition, a vessel will lack nationality, for example, "if no state has ever authorized [the vessel] to fly its flag, if a state has cancelled its authorization, or if the political entity that authorized a ship to fly its flag is not recognized as an international person." Rosero, 42 F.3d at 171; see also id. ("[A] vessel is without nationality if it is not authorized to fly the flag of any state."); Matos-Luchi, 627 F.3d at 16 (Lipez, J., dissenting) ("Under international law, a stateless vessel is simply one that does not have a valid grant of nationality from any country.").

Authorities encountering a vessel on the high seas would not be aware of some of these circumstances -- e.g., if a state

has cancelled a vessel's registration -- and thus will be unable to definitively determine nationality by sight even if a vessel is flying a flag. Nonetheless, international law recognizes a presumption of nationality in the flag-flying situation, among others. We have noted that "[b]y custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation." Matos-Luchi, 627 F.3d at 5 (citing Lassa Oppenheim, International Law § 261, at 594-96 (H. Lauterpacht ed., 8th ed. 1955)); see also United States v. Bustos-Guzman, 685 F.2d 1278, 1280 (11th Cir. 1982) (per curiam) (noting that flying a flag is generally "prima facie proof" of nationality under international law); The Chiquita, 19 F.2d 417, 418 (5th Cir. 1927) ("The flag under which a merchant ship sails is prima facie proof of her nationality.").

Absent a flag or papers, "a vessel may also traditionally make an oral claim of nationality when a proper demand is made." Matos-Luchi, 627 F.3d at 5; see also Aybar-Ulloa, 987 F.3d at 5 (quoting Matos-Luchi, 627 F.3d at 5); United States v. Obando, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J., specially concurring) (noting that, under "longstanding principles of admiralty law," the master "speak[s] on behalf of the ship" and must be the one to make a verbal claim of nationality); The Little Charles, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C. Va. 1818) ("The

vessel acts and speaks by the master."); Anderson, supra, at 341 (noting that a vessel may claim nationality "by showing its flag, presenting its documents, or making some other outward or oral claim to a nationality" (emphasis added)).  The MDLEA itself recognizes this form of asserting nationality, stating that "[a] claim of nationality or registry under this section includes . . . a verbal claim of nationality or registry by the master or individual in charge of the vessel."  46 U.S.C. § 70502(e)(3).

International law also recognizes two specific circumstances in which a vessel may be deemed stateless regardless of its actual status and absent any effort to determine its nationality: when the vessel refuses to claim any nationality or when it claims more than one nationality.  See Matos-Luchi, 627 F.3d at 6-7 (stating that "a vessel may be deemed 'stateless' . . . if it fails to display or carry insignia of nationality and seeks to avoid national identification" by "refus[ing], without reasonable excuse, to reveal its" nationality (quoting Meyers, supra, at 322) (internal quotation marks omitted)); UNCLOS art. 92, § 2 (stating that "[a] ship which sails under the flags of two or more States . . . may be assimilated to a ship without nationality"); The Commander's Handbook on the Law of Naval Operations ¶ 3.11.2.4 (2017), https://www.gc.noaa.gov/pdfs/CDRs_HB_on_Law_of_Naval_Operations_AUG17.pdf (stating that "[a] vessel may be assimilated to a vessel

without nationality," inter alia, "when the vessel makes multiple claims of nationality . . . or the master's claim of nationality differs from the vessel's papers").[48]

Hence, whether authorities are seeking to ascertain nationality in the first place -- by examining documents or eliciting a verbal claim -- or to resolve a concern about nationality that was declared by means of a flag, they may need close contact with the vessel and its master. It is therefore

_____

[48] The 2017 version of the Commander's Handbook -- applicable to the U.S. Navy, Marine Corps, and Coast Guard -- also states that a vessel may be "treated as one without nationality" when, among other factors, it displays no "identifying characteristics," when -- consistent with § 70502(d)(1) -- the master makes no claim of nationality or registry, or when "[t]he claim of registry or the vessel's display of registry is either denied or not affirmatively and unequivocally confirmed by the State whose registry is claimed." Commander's Handbook ¶ 3.11.2.3 (2017), supra; see also id., References 4 (listing MDLEA, 46 U.S.C. §§ 70501-70507). Interestingly, the Handbook's previous version, in effect when appellants were detained, did not include the failure-to-verify scenario that mirrors § 70502(d)(1)(C) of the MDLEA. Rather, its list of characteristics of a stateless vessel all relied on inconsistencies in a vessel's presentation of nationality to observers or the absence of, or refusal to provide, identification. See Commander's Handbook ¶ 3.11.2.4 (2007), https://www.marines.mil/Portals/1/Publications/MCTP%2011-10B%20(%20Formerly%20MCWP%205-12.1).pdf?ver=2017-07-11-151548-683 (providing "a partial list of factors that should be considered in determining whether a vessel is appropriately assimilated to stateless status: (1) No claim of nationality; (2) Multiple claims of nationality; (3) Contradictory claims or inconsistent indicators of nationality (e.g. master's claim differs from vessel's papers; homeport does not match nationality of flag); (4) Changing flags during a voyage; (5) Removable signboards showing different vessel names and/or homeport; (6) Absence of anyone admitting to be the master; displaying no name, flag, or other identifying characteristics; and (7) Refusal to claim nationality").

understood that international law's so-called "right of visit" permits authorities to inquire, board, and conduct a limited search "designed to elicit information about the vessel's identification and registration."  Cuevas-Esquivel, 905 F.2d at 513; see also Aybar-Ulloa, 987 F.3d at 6 (recognizing that a "clearly-marked law enforcement ship of any state may board [a private ship] . . . if there is reason to suspect that the ship . . . is without nationality" (quoting Restatement (Third) of Foreign Relations Law of the United States § 522(2)(b) (1987)) (omissions in original)); United States v. Cortes, 588 F.2d 106, 109 (5th Cir. 1979) (stating that, under international law, "stateless vessels are subject to this type of examination").[49]  The question in this appeal, addressed in Section V.C infra, is whether international law

---

[49] The "right of visit" under international law allows a "warship" (which would include a law enforcement ship like the Coast Guard vessel here) to stop and question a foreign ship if "there is reasonable ground for suspecting that the ship is engaged in piracy," slave trading, or illegal broadcasting, "is without nationality," or, although flying a foreign flag, is actually of the same nationality as the warship.  UNCLOS art. 110, § 1. However, the right of visit does not provide an independent ground for exercising jurisdiction over a vessel, and certainly does not allow a state to apply its domestic laws to those aboard that vessel.  Rather, it is simply a mechanism for a state to investigate suspected wrongdoing and then take actions within its authority under international law.  See, e.g., Penelope Mathew, Address - Legal Issues Concerning Interception, 17 Geo. Immigr. L.J. 221, 224-25 (2003) (discussing the limited nature of the right of visit and noting that "a State would have to rely on some positive basis of jurisdiction . . . to exercise jurisdiction over persons on a stateless ship").

permits Congress to dictate the results of such an inquiry as provided in § 70502(d)(1)(C) of the MDLEA.

### 5. Summary: The Felonies Clause and Stateless Vessels

Our review of the law governing jurisdiction on the high seas thus reveals clear signs in multiple sources -- the historical record, the well-established perspective in the late eighteenth century on the role of individual nations in the international sphere, and contemporaneous legal precedent -- that the Framers' invocation of international law terminology in the Define and Punish Clause was deliberate. Seeking to ensure their new nation's compliance with international law, the Framers invoked principles drawn from that law in drafting the Define and Punish Clause generally and the Felonies Clause specifically. In particular, they knew the distinction in international law between "Piracies," which can be punished by any country wherever they occur, and other serious crimes on the high seas, which can be punished by a country only when committed by individuals subject to its jurisdiction. The Framers' goal of incorporating respect for international norms into the federal system thus makes clear that, under the Felonies Clause, Congress's authority to set the boundaries of domestic law on the high seas must be consistent with international law principles. Pursuant to those principles, the key to determining whether Congress can apply domestic law to foreign nationals on a non-U.S. vessel on the high seas ordinarily will depend on whether

international law would deem the vessel to be "without nationality" -- i.e., stateless. Finally, international law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality.

With that understanding of the applicable law, we turn to the question of whether Congress exceeded its power to "define and punish . . . Felonies committed on the high Seas" in the challenged provision of the MDLEA.

## C.  Constitutionality of § 70502(d)(1)(C)

The MDLEA reflects Congress's objective of addressing, to the full extent of its authority, the scourge of drugs entering the United States from abroad. See Matos-Luchi, 627 F.3d at 11 (Lipez, J., dissenting) (noting that the MDLEA and its predecessor, the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat. 1159 (1980), manifest Congress's objective to "give the Justice Department the maximum prosecutorial authority permitted under international law" (quoting S. Rep. 96-855, at 2 (1980))); id. at 7 ("The MDLEA was responding to repeatedly frustrated efforts to prosecute maritime drug trafficking."). Undoubtedly mindful of the prohibition against applying domestic law to foreigners traveling on foreign vessels on the high seas, Congress plainly sought in the MDLEA provision defining a stateless vessel to reach as broadly as possible through an expansive definition of statelessness. The statute, however, can reach no farther than

the authority granted to Congress by the Felonies Clause, which, as we have determined, is constrained by the norms of international law.

As detailed above, the MDLEA provides three descriptions for a "vessel without nationality" in § 70502(d)(1). See 46 U.S.C. § 70502(d)(1).[50] Two are clearly consistent with international law: when the nation whose registry is claimed denies the claim, id. § 70502(d)(1)(A), and when the individual in charge of a vessel fails to make a claim of nationality or registry for the vessel upon request of an authorized United States officer, id. § 70502(d)(1)(B); see, e.g., Matos-Luchi, 627 F.3d at 6 (involving

---

[50] For convenience, we provide here the full text of § 70502(d)(1):

> In this chapter, the term "vessel without nationality" includes --
>
> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. § 70502(d)(1).

a refusal to make a claim of nationality).  The third definition, however -- the one at issue here -- allows a vessel to be treated as stateless where there is a claim of nationality recognized by international law but the identified country neither confirms nor denies that claim.  See 46 U.S.C. § 70502(d)(1)(C).

This provision thus treats a response that reports only that the named country is unable to confirm nationality -- or the country's failure to respond at all to U.S. inquiry -- as evidence that is equivalent to an outright denial of a master's claim of nationality or registry.  In other words, § 70502(d)(1)(C) displaces the prima facie showing of nationality that arises from an oral assertion of nationality or registry -- made in accordance with international law -- without any affirmative evidence to the contrary.  See Bustos-Guzman, 685 F.2d at 1280 (referring to the "prima facie proof" of nationality that arises from flying a flag); The Chiquita, 19 F.2d at 418 (same); 46 U.S.C. § 70502(e) (listing flying a flag and a verbal claim as alternative methods of making a claim of nationality).  In so doing, § 70502(d)(1)(C) adds a new category to the limited circumstances in which international law deems a vessel stateless (the refusal to claim a nationality, claiming more than one nationality, and disavowal of a claim of nationality by the named country).  A response stating only that the country is unable to confirm nationality, or the country's failure to provide any response, suffices to nullify even an

unequivocal claim of nationality or registry made by the person in charge of the vessel.

The government contends that this variation on deeming a vessel stateless is implicitly, if not explicitly, recognized in international law. The government asserts that international law requires a vessel not only to make a claim of nationality, but also to "'be in a position to provide evidence of [nationality].'" Appellee's Br. at 29 (quoting Matos-Luchi, 627 F.3d at 6). Consequently, the government proposes, an absence of "affirmative[] and unequivocal[]" confirmation from the claimed country may properly be relied upon in deeming the vessel stateless. Id. at 36.

In making this assertion, the government relies heavily on dicta in Matos-Luchi, a case in which the defendants had declined to make a claim of nationality in response to a request from Coast Guard personnel. See 627 F.3d at 2.[51] As we have described, avoiding national identification is a well-established basis for deeming a vessel stateless, and it is incorporated into the MDLEA in § 70502(d)(1)(B). See supra note 50; see also, e.g., Meyers, supra, at 322 ("[A] ship which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may

---

[51] In Matos-Luchi, when the Coast Guard approached a small vessel whose crew members were suspected of drug trafficking, the crew initially fled and, when subsequently apprehended, "declined to make a claim of nationality" for their vessel. 627 F.3d at 2.

be treated as stateless." (internal quotation marks omitted)). However, the Matos-Luchi majority went beyond that indisputable basis for deeming a vessel stateless -- and the facts before it -- to suggest that an oral declaration of nationality is inadequate if the vessel's master provides no other evidence of the claimed nationality. See 627 F.3d at 6. Stated without examination of the issue, the majority's dicta, which is not binding on another panel, does not support the government's contention that international law allows a vessel to be deemed stateless based solely on the absence of confirming evidence of the master's verbal claim. As the government acknowledges, the MDLEA recognizes "a verbal claim of nationality or registry by the master" as a "claim of nationality or registry" equivalent to flying a flag or producing "documents evidencing the vessel's nationality." 46 U.S.C. § 70502(e). Rejecting a verbal claim of nationality based solely on a lack of substantiating evidence effectively negates that distinct method for claiming nationality recognized both by the MDLEA and by international law.

The government also directly invokes international law to support its position. In its supplemental brief, the government cites articles 17(1) and (2) of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, 1582 U.N.T.S. 95 ("UN Narcotics Convention"), and article 5(2) of the 1958 Convention on the High

Seas, supra, in arguing that the United States may deem a vessel stateless if neither its master nor the claimed nation substantiates a verbal claim of nationality. Neither of these sources supports that proposition. The first cited provision of the UN Narcotics Convention calls for cooperation "to suppress illicit traffic by sea, in conformity with the international law of the sea," id. art. 17(1), and the second states that a party with "reasonable grounds to suspect that a vessel flying its flag or not displaying a flag or marks of registry is engaged in illicit traffic may request the assistance of other [p]arties in suppressing its use for that purpose," id. at 17(2). These principles of cooperation do not speak to the circumstances in which international law deems a vessel stateless.

The provision of the 1958 Convention on the High Seas cited by the government provides that "each state shall issue to ships to which it has granted the right to fly its flag documents to that effect." The UNCLOS contains a nearly identical provision, see UNCLOS art. 91, § 2, and another UNCLOS provision specifically addresses registration, requiring states to "maintain a register of ships containing the names and particulars of ships flying its flag, except those which are excluded from generally accepted international regulations on account of their small size," id. art. 94, § 2(a). The government suggests that such provisions create an expectation that all vessels will carry documents and

that, if a vessel's master does not substantiate a verbal claim with documents or other evidence, the claimed country of nationality "has accepted through its international treaty obligations that the vessel may be deemed stateless." Appellee's Supp. Br. at 16.

However, these treaty provisions demanding that countries issue documents evidencing vessel nationality say nothing about when a vessel may be deemed stateless. Nor can the provisions reasonably be construed to provide consent to the exercise of jurisdiction over a signatory's vessel by all other signatories based solely on the master's failure to produce documents in support of a claim of nationality. Indeed, as we have noted, consent by the country whose nationality is claimed provides a separate basis for jurisdiction under the MDLEA, see 46 U.S.C. § 70502(c)(1)(C), and the statute specifies that consent "may be obtained by radio, telephone, or similar oral or electronic means," id. § 70502(c)(2)(A). The government's theory of implicit consent is at odds with this scheme.

The government also attempts to infer from treaty provisions a principle of international law that when a country both fails to confirm a claim of registration or nationality and the vessel carries no registration or other identifying documents the vessel may be deemed stateless. This theory conflates two discrete international law issues. Even accepting documentation

requirements as within customary international law, it does not follow that a country's failure to issue identifying documents or "maintain a register" renders a vessel stateless when its master has verbally claimed that country's nationality. The relevant question is not whether the claimed country has satisfied its obligations under international law. Rather, the question is what type of inquiry and response suffices to permit the United States to deem a vessel stateless despite a claim of nationality recognized by international law. On that question, the government cites no source of international law expressly recognizing a lack of documents, or the claimed country's failure to confirm nationality (instead of an outright denial), as a basis for overcoming the prima facie showing of nationality arising from the master's oral declaration.

That lack of support for the government's proposition is unsurprising. As we have explained, the master's oral declaration has long sufficed under international law to establish a presumption of nationality. See, e.g., N.P. Ready, Ship Registrations 3 (3d ed. 1998) ("A vessel may be considered as possessing the nationality of a State even though she is unregistered, possesses no documents evidencing that nationality, nor even flies the flag of that State."); see also Aybar-Ulloa, 987 F.3d at 5 (observing that, "[w]ithout a flag or papers, a vessel may also traditionally make an oral claim of nationality

when a proper demand is made" (quoting <u>Matos-Luchi</u>, 627 F.3d at 5)).[52] That presumption is sensibly overcome by the named country's express denial of the claim, a scenario long embedded in international law.

However, a response stating that the country can neither confirm nor deny the claim, or the named country's failure to respond at all, may say very little about the veracity of the master's assertion of nationality. Indeed, the inability to confirm the claim may have more to do with the responding country's bureaucracy than with the vessel's status. The facts in <u>United States</u> v. <u>Hernandez</u>, 864 F.3d 1292 (11th Cir. 2017), graphically illustrate the problem with § 70502(d)(1)(C). The captain of a vessel told Coast Guard officers that his boat was registered in Guatemala -- a truthful claim -- and he and the other three crew

---

[52] In addition to the traditional methods of claiming nationality discussed above -- flying the flag, presenting documents, and oral declaration -- authorities may in some instances look to the nationality of the vessel's owner. <u>See</u>, e.g., <u>The Chiquita</u>, 19 F.2d at 418 ("If [a vessel] is not properly registered, her nationality is still that of her owner."). However, whether the owner's nationality establishes that of the vessel will depend on the practice of the particular country. As discussed above, "a State is absolutely independent in framing the rules concerning the claim of vessels to its flag." Oppenheim (8th ed.), <u>supra</u>, at 595; <u>see</u> <u>also</u> <u>id.</u> (noting that Great Britain "allow[s] only such vessels to sail under [Great Britain's] flags as are the exclusive property of their citizens or corporations established on their territory," while "[o]ther [countries] allow vessels which are the property of foreigners" to do so); Churchill & Lowe, <u>supra</u>, at 213 n.19 (noting that a country may not register small ships but may "regard such ships as having its nationality if they are owned by its nationals").

members all identified themselves as Guatemalan citizens. Id. at 1297. Indeed, at some point, Guatemalan registration documents were found on the vessel. Id. Nonetheless, when asked by the Coast Guard to confirm the registry claim, the government of Guatemala responded that it could neither confirm nor deny it. Id. Although the vessel plainly was not stateless, the court rejected the defendants' challenge to their convictions under the MDLEA because Guatemala had not "'affirmatively and unequivocally assert[ed]' the ship's registry." Id. at 1299 (quoting § 70502(d)(1)(C)).[53] In other words, the vessel was deemed

---

[53] The defendants in Hernandez contended that jurisdiction under the MDLEA was improper because their vessel was in fact registered and because the Coast Guard had identifying information about their vessel "that would easily have confirmed its registry," but "failed in bad faith to convey that information" to the Guatemalan government. 864 F.3d at 1299. In rejecting those contentions, the court observed that "[t]he MDLEA does not state what information the United States must convey to the foreign government during its communication, and it does not state that actual registry overrides the [Department of State] certification's proof of statutory statelessness." Id. "MDLEA statelessness," the court explained, "does not turn on actual statelessness, but rather on the response of the foreign government." Id. The court further observed that, given the MDLEA's "clear terms" deeming their vessel stateless, "any diplomatic consequences of the criminal prosecution" -- including any violation of international law -- were the responsibility of the executive branch and not a basis for undoing the convictions. 864 F.3d at 1297.

One defendant in Hernandez also argued "that the MDLEA is an unconstitutional assertion of Congressional power because it reaches stateless vessels on the high seas without a proven nexus to the United States" -- an argument rejected there as foreclosed by Eleventh Circuit precedent. 864 F.3d at 1303. The Hernandez defendants did not make the argument asserted here that § 70502(d)(1)(C) is unconstitutional because Congress acted beyond

"stateless" even when verification of its nationality should have been easily accomplished.

Moreover, where -- as in <u>Hernandez</u> and here -- the master's oral declaration of nationality is consistent with the citizenship or nationality of all individuals aboard the vessel, the declaration is particularly forceful. To reject the master's declaration of nationality in such circumstances based solely on the claimed country's failure to provide affirmative and unequivocal confirmation -- or its failure to respond at all -- would eviscerate a method long accepted for identifying a vessel's nationality under international law. We cannot infer displacement of that method merely based on treaty provisions imposing obligations on signatory countries to register vessels or issue other documents.[54]

That is not to say that the government's emphasis on registration or documentary evidence of nationality is wholly misplaced. International law does, in general, promote a system

_____

its authority under the Felonies Clause in defining a vessel without nationality to include a vessel whose master makes a verbal claim of nationality that is not affirmatively and unequivocally confirmed by the identified country.

[54] Importantly, § 70502(d)(1)(C) on its face applies not only to verbal claims of nationality, but to any claim of registration or nationality, even one based on documentation. By its terms, therefore, it allows the United States to reject a claim of registration or nationality that is supported by documentary evidence based solely on an equivocal response, or no response at all, from the identified country.

of registration.[55]  It is reasonable to expect that registered vessels would have documents onboard, and, if not, that the claimed country of nationality would be able to easily confirm a legitimate claim by checking its registry.  However, not all vessels must be registered.  Small vessels are excluded from the UNCLOS registry requirement, see UNCLOS art. 94, § 2(a), perhaps because some countries typically do not register small vessels -- whether defined by length or by tonnage.  In the United States, for example, the registration of smaller boats is generally left to individual states.  See 46 U.S.C. § 12102(b) (providing that "[a] vessel of less than 5 net tons may engage in a trade without being

---

[55] As we recognized in Aybar-Ulloa, it is important that some country exercise jurisdiction over a vessel.  See 987 F.3d at 5. A flag state

> has several responsibilities [under international law], including the responsibility to ensure that its ships comply with domestic and international law and regulations.  . . .  Most notably, a state must exercise "jurisdiction and control [over its fleet] in administrative, technical, and social matters."  Control includes ensuring that ships are seaworthy and comply with relevant labor regulations and criminal laws.

Allyson Bennett, Note, That Sinking Feeling: Stateless Ships, Universal Jurisdiction, and the Drug Trafficking Vessel Interdiction Act, 37 Yale J. Int'l L. 433, 439 (2012) (second alteration in original) (footnotes omitted) (citing various provisions of the UNCLOS); see also Purchase of Ships of Belligerents by Neutrals, 6 Op. U.S. Att'y Gen. 638, 640 (1854) ("The law of nations and common sense combine to require that every ship shall have a nationality[.]").

documented"); <u>id.</u> § 12301 (providing that "[a]n undocumented vessel equipped with propulsion machinery of any kind shall have a number issued by the proper issuing authority in the State in which the vessel principally is operated"); <u>see also</u> U.K. Mar. & Coastguard Agency, Guidance: Vessel Classification and Certification (2018), https://www.gov.uk/guidance/vessel-classification-and-certification#certification-requirements-for-uk-vessels (stating that, in the United Kingdom, a certificate of registry is optional for "small commercial vessel[s]," defined as vessels under 24 meters (roughly 79 feet)); R.R. Churchill & A.V. Lowe, <u>The Law of the Sea</u> 213 n.19 (3d ed. 1999) (noting that "a State may not require, or permit, the registration of ships below a certain size"); Meyers, <u>supra</u>, at 160 ("Many states . . . do not issue documents to ships with a tonnage below a given figure.").[56]

---

[56] We note that 24 meters (roughly 79 feet) is a cutoff point for the applicability of several major international conventions. <u>See</u>, <u>e.g.</u>, International Convention on Tonnage Measurement of Ships art. 4, June 23, 1969, 1291 U.N.T.S. 4 (exempting "ships of less than 24 metres (79 feet) in length"); International Convention on Load Lines art. 5, Apr. 5, 1966, 9159 U.N.T.S. 134 (same); <u>see also</u> Gudrun Petursdottir, Olafur Hannibalsson & Jeremy M.M. Turner, Part II: International Conventions and Guidelines on Safety at Sea, <u>in</u> <u>Safety at Sea as an Integral Part of Fisheries Management</u>, Food & Agric. Org. of the United Nations (2001), available at https://www.fao.org/3/X9656E/X9656E01.htm (stating that recommendations and conventions developed by the International Maritime Organization and International Labor Organization "are aimed at large vessels, primarily the merchant fleet on international voyages" and observing that "[s]ome conventions explicitly exempt fishing vessels, and most do not apply to vessels under 24m thus leaving out the majority of fishing vessels and transport boats in the developing countries").

Hence, proof of a vessel's nationality via a centralized registry or other evidence of registration may be unavailable, and a country whose citizens have properly claimed nationality on behalf of their vessels thus may be unable either to confirm or deny those claims when contacted by the U.S. Coast Guard or other authorities.[57]

Importantly, we do not suggest that international law requires the United States to accept a bare assertion of nationality where there is conflicting evidence and attempts to resolve the conflict prove fruitless. Although the master's oral declaration constitutes prima facie proof of nationality, that verbal assertion can be undermined by contrary evidence, as is the case for any prima facie showing. For example, if the vessel's claimed nationality differs from the nationality of most crew

_____

According to the government, appellants' boat was 35 feet in length. See supra note 4.

[57] That may be what occurred in this case. The Department of State's Certification, which describes the measures taken to verify the master's claim of nationality, indicates that, on the day the Coast Guard encountered the vessel -- October 29, 2015 -- U.S. officials "requested that the Government of the Republic of Costa Rica confirm the registry or nationality of the suspect vessel, and, if confirmed, provide disposition instructions." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (emphasis added). The Certification reports that, nearly three months later, "the Government of Costa Rica replied that it could not confirm [the] vessel's registry." Id. (emphasis added). Separately, although not presented as an issue on appeal, the time lag between the defendants' initial detention and Costa Rica's response to the verification request strikes us as problematic, given that the status of a vessel determines whether U.S. law enforcement officials may proceed with prosecuting the crew members under the MDLEA.

members, or if a small vessel is interdicted far from the claimed country,[58] U.S. authorities could properly seek verification of the master's claim.  In other words, where surrounding facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless absent the sort of confirmation required by § 70502(d)(1)(C).  See, e.g., Commander's Handbook (2017), supra, ¶ 3.11.2.4 (stating that "[a] vessel may be assimilated to a vessel without nationality" if, inter alia, there are contradictory or inconsistent indicators of nationality).

Put differently, when U.S. authorities are presented with mixed signals about the nationality of a vessel, it would be permissible under international law for the United States to seek confirmation from the country of asserted nationality and, if none is forthcoming, to treat the vessel as stateless.  As we have described, a vessel may be deemed stateless under international law both when it "seeks to avoid national identification," Matos-Luchi, 627 F.3d at 6, and when it "sails under the flags of two or

---

[58] The government posits such a scenario, asserting that it would be absurd to require countries to accept unconfirmed verbal claims of nationality because "[d]rug traffickers . . . could falsely claim their vessels are the nationals of a small Micronesian island or, more perplexingly, a country like North Korea with limited diplomatic contacts." Appellee's Supp. Br. at 15.  We do not disagree.  Our analysis permits further inquiry when a vessel's master claims a nationality that is at odds with surrounding circumstances, including the vessel's location or the nationality of the master and crew.

more States," UNCLOS art. 92, § 2 -- two situations that produce ambiguity concerning the vessel's nationality.[59]   International law, by inference, likewise permits treating a vessel as stateless when its master makes a verbal claim of nationality that is both unsubstantiated and inconsistent with other relevant indicators of the vessel's nationality.   As when the master of a vessel avoids claiming a nationality or when a vessel indicates that it is attempting to claim multiple nationalities, conflicting signals of nationality create an ambiguity that properly gives rise to inquiry and, absent confirmation, permits designation of the vessel as "without nationality."[60]

---

[59] These two circumstances are reflected in the MDLEA's provisions addressing vessels without nationality.   As we have described, § 70502(d)(1)(B) covers the avoidance scenario, defining a "vessel without nationality" to include one for which the master fails "to make a claim of nationality or registry" upon inquiry.   The scenario of multiple identities is covered in § 70502(c)(1)(B), which states that a "vessel subject to the jurisdiction of the United States" includes "a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas."   Paragraph (2) of the Convention states: "A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality."  1958 Convention on the High Seas, supra, art. 6.

[60] As described above, the government in its supplemental briefing suggests that the circumstances here involved mixed signals because, according to a Coast Guard officer's statement, Reyes-Valdivia initially stated that the vessel lacked a nationality.   Although the government noted the reported disclaimer of nationality in its Motion in Limine in support of jurisdiction, it chose for whatever reason not to include that fact in the version of the facts presented at appellants' change-of-plea hearing or in appellants' plea agreements.  See supra.

However, that conflicting-signals limitation is not part of § 70502(d)(1)(C) as currently enacted. Rather, as we have described, even where the circumstances offer no rationale for displacing the prima facie showing of nationality established through a verbal claim, § 70502(d)(1)(C) treats a vessel as stateless based solely on the named country's failure to respond "affirmatively and unequivocally" to U.S. inquiry. The statute on its face is thus inconsistent with international law,[61] and we have no license to rewrite it to satisfy constitutional requirements. See Iancu v. Brunetti, 139 S. Ct. 2294, 2301 (2019) (stating that, although the Court "may interpret 'ambiguous statutory language'

_____

Accordingly, as indicated in our discussion of the government's Class argument, see Section III supra, it may not rely now on that untested fact. Moreover, any attempt to raise a new theory of prosecution at this juncture would raise serious due process questions.

[61] Although the government in its briefing at times depicts appellants' claim that § 70502(d)(1)(C) is unconstitutional as an as-applied challenge, that characterization is inapt. The classification of a vessel as stateless based solely on the named country's indecisive response to inquiry, or its failure to respond, is a "constitutional flaw evident in the statutory terms themselves." Marc E. Isserles, Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement, 48 Am. U.L. Rev. 359, 365 (1998); cf. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). The mere fact that a cognizable legal challenge by necessity concerns the application of a statute to individuals does not transform a facial challenge into an as-applied challenge. See generally Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321 (2000).

to 'avoid serious constitutional doubts,' . . . '[w]e will not rewrite a law to conform it to constitutional requirements'" (first quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009), and then quoting United States v. Stevens, 559 U.S. 460, 481 (2010))); see also Jennings v. Rodriguez, 138 S. Ct. 830, 843 (2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."). It is up to Congress to narrow the language of § 70502(d)(1)(C) if it so chooses.[62]

Even the absence of conflicting evidence of nationality, however, does not mean that foreign nationals engaged in drug trafficking on the high seas can evade prosecution based solely on a verbal claim -- whether true or false -- of a vessel's nationality. The Coast Guard and other countries' authorities can always ask the claimed country of nationality for consent to arrest and prosecute the individuals onboard. See 46 U.S.C. § 70502(c)(1)(C) (stating that a "vessel subject to the jurisdiction of the United States" includes "a vessel registered

---

[62] We recognize that the three examples of vessels without nationality listed in § 70502(d)(1) are not exclusive, and the government might argue in future cases -- as the government belatedly argued in this case -- that a vessel may be properly deemed without nationality under the MDLEA based solely on mixed signals, without the need to make any inquiry of the sort required by § 70502(d)(1)(C). We need not, and therefore do not, consider the viability of such an argument, including whether reliance on a rationale for deeming a vessel without nationality that is not expressly described in the MDLEA would raise due process concerns.

in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States"); see also, e.g., Cardales-Luna, 632 F.3d at 736 (noting that the United States obtained consent from the government of Bolivia, which "waived objection to the enforcement of U.S. laws by the United States with respect to the vessel . . . , including its cargo and all persons onboard" (quoting State Department certification)); Matos-Luchi, 627 F.3d at 18 (Lipez, J., dissenting) (noting that the government in that case had failed to obtain consent from the likely country of nationality, "which could have provided a fallback position in the event that the evidence of statelessness proved deficient").

Indeed, it is common practice for countries, including the United States, to negotiate bilateral and multi-lateral agreements to facilitate the apprehension of drug traffickers operating on the high seas. See, e.g., Casavant, supra, at 205 (stating that the United States has entered into twenty-seven such agreements, including with countries in South America, Central America, and the Caribbean, providing a "process by which the two [or more] nations can operate to suppress drug trafficking while also respecting flag state jurisdiction").[63] The United States

---

[63] As previously noted, the United States relied on such an agreement to board appellants' vessel. The State Department's Certification reports that "United States law enforcement personnel boarded the vessel" "pursuant to Article V of the

also can address its concerns about maritime drug trafficking by seeking to persuade other countries to take enforcement action against their own vessels and nationals. See generally James Kraska, Broken Taillight at Sea: The Peacetime International Law of Visit, Board, Search, and Seizure, 16 Ocean & Coastal L.J. 1, 11 (2010) ("Nowhere is collaboration [among countries] so ingrained than in counter-drug operations at sea."). In this regard, a 2021 report by the U.S. Department of State noted that the Coast Guard of Costa Rica -- the claimed flag-state here -- "is a successful regional partner with the United States for maritime interdiction." See U.S. Dep't of State, Bureau of Int'l Narcotics & Law Enforcement Affairs, Int'l Narcotics Control Strategy Report, Vol. 1, Mar. 2021, at 117; see also id. at 119 ("[A] bilateral agreement between the United States and Costa Rica is regularly used in maritime drug interdiction operations[.]").

What the United States cannot do consistently with the Constitution, however, is arrest and prosecute foreigners on foreign vessels by relying on a concept of statelessness that conflicts with international law. And that is what § 70502(d)(1)(C) allows. It overrides international law by treating a country's failure to supply an "affirmative[] and

Agreement between the Government of the United States of America and the Government of the Republic of Costa Rica Concerning Cooperation to Suppress Illicit Traffic." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016).

unequivocal[]" confirmation of nationality -- including a failure to respond at all -- as evidence sufficient to invalidate an oral claim of foreign nationality even when there are no mixed signals that would call the claim into doubt.  That is, the MDLEA treats as stateless a vessel that, under international law, would be a vessel <u>with</u> nationality.  Accordingly, the prosecution of foreign nationals traveling on such a vessel for a violation of U.S. law is impermissible under the Felonies Clause of the Constitution, the only source of authority asserted for Congress's adoption of the MDLEA.  <u>See</u> <u>Aybar-Ulloa</u>, 987 F.3d at 4 (referring to "Congress's power under Article I '[t]o define and punish Piracies and Felonies committed on the high Seas'" (quoting U.S. Const. art. 1, § 8, cl.10)); <u>Mitchell-Hunter</u>, 663 F.3d at 49 n.3 (explicitly stating that "[t]he MDLEA is derived from Congress' power to 'define and punish Piracies and Felonies committed on the high Seas'" (quoting U.S. Const. art. 1, § 8, cl.10)); <u>Cruickshank</u>, 837 F.3d at 1187 (same).

## VI.

The Framers intended international law to be a constraint on Congress's authority "[t]o define and punish . . . Felonies committed on the high Seas."  Two centuries ago, the Supreme Court held that Congress lacked authority under the Felonies Clause to extend U.S. jurisdiction to felonies committed by foreign nationals on foreign vessels.  <u>See</u> <u>Furlong</u>, 18 U.S. (5

Wheat.) at 198; Palmer, 16 U.S. (3 Wheat.) at 632-34.  With § 70502(d)(1)(C), Congress violated this principle, extending U.S. jurisdiction beyond the limits of international law and, hence, beyond the authority conferred by the Felonies Clause.

In this case, relying on the authority provided by § 70502(d)(1)(C), the Coast Guard treated a vessel whose master made a claim of Costa Rican nationality cognizable under international law as a "vessel without nationality."  The United States government improperly relied on that classification -- in violation of constitutional limits -- to arrest and prosecute Costa Rican citizens, Reyes-Valdivia and Dávila-Reyes.  We therefore vacate their convictions and remand the case to the district court with instructions to dismiss the MDLEA charges against them.[64]

So ordered.

-CONCURRING OPINION FOLLOWS-

---

[64] Because we vacate appellants' convictions based on their Felonies Clause argument, we do not reach their due process challenges to the MDLEA or Reyes-Valdivia's appeal from the district court's application of the "captain" sentencing enhancement.

**HOWARD, <u>Chief Judge</u>, concurring in the result.** As noted in the majority opinion, we withdrew our prior panel opinion and granted panel rehearing after the en banc court issued its opinion in <u>Aybar-Ulloa</u>. In <u>Aybar-Ulloa</u>, the en banc court did not address arguments raised by the parties about the protective principle. In light of the now uncertain status of our protective principle precedent, like my colleagues I am reluctant to unquestioningly rely on the protective principle to affirm the convictions underlying these appeals. Unlike my colleagues, I would not decide these appeals on constitutional grounds.

I would instead reverse these convictions on the basis that the agreed facts do not support the statelessness claim charged by the government.[65] The government claims the vessel is stateless per 46 U.S.C. § 70502(d)(1)(C), which provides that 'vessels without nationality' include:

---

[65] Although this ground for reversal of the convictions was not initially raised in the appeals, the panel was concerned enough about the mismatch that we requested that the parties brief the issue, and they complied. That the issue was addressed by the parties through supplemental briefing may not by itself be reason enough for us to bypass appellate waiver -- including not only the failure to raise the issue on appeal but also, in the case of Dávila-Reyes, the affirmative waiver of appeal contained in the plea agreement. But the majority's constitutional analysis depends in part on an equivalency between "nationality" and "registry" that it finds in § 70502(d)(1)(C). My disagreement about whether that equivalency exists is consequential, such that it should not be relegated to a dicta detour along the way to finding waiver. At this stage of the proceedings, the gap in the statelessness determination under § 70502(d)(1)(C) is stark enough for me to join the majority, albeit in result only.

a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

The majority asserts that the facts here meet the criteria described above in § 70502(d)(1)(C) because § 70502 treats "registry" and "nationality" synonymously. But I find no support for that observation in the text of § 70502 or in our cases.

To reach its conclusion that "registry" and "nationality" are used interchangeably in the statute, the majority argues that interpreting these terms to have independent meanings would leave an incongruous hole in statutory coverage; how, the majority wonders, could Congress have intended to cover a situation in which a master asserts Costa Rican registration, but not Costa Rican nationality?

The answer becomes apparent when we examine the overall legal terrain. Section 70502(d)(1) establishes three avenues to find statelessness. But this list is not exclusive, and leaves in place other ways in which the government can establish lack of nationality. See United States v. Matos-Luchi, 627 F.3d 1, 4 (1st Cir. 2010); id. at 15 (Lipez, J., dissenting) ("As the majority correctly holds, Congress did not intend those three examples [in § 70502(d)(1)] to be exhaustive. The MDLEA extends to vessels that are considered stateless under international law, even if those vessels do not fall within one of the specifically

enumerated categories."); see also United States v. Miranda, 780 F.3d 1185, 1197 (D.C. Cir. 2015) ("[T]he statute contains three nonexclusive examples of 'vessels without nationality,' each of which turns on the 'registry' of the vessel."); United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (Alito, J.).  Thus, giving meaning to all the terms in § 70502(d)(1) does not immunize vessel masters who claim foreign nationality rather than registry.

Here, the master asserted Costa Rican nationality for the vessel; at no point did he assert Costa Rican registry. Accordingly, by its terms, § 70502(d)(1)(C) is not applicable, nor did the government assert an alternative basis for finding statelessness when prosecuting appellants.  I would reverse the convictions on that ground and go no further.